THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSEPH JOHNSTON, Defendant-Appellant.

First District (5th Division)   No. 1—91—3042

Opinion filed October 7, 1994.

528

Daniel D. Yuhas and Arden J. Lang, both of State Appellate Defender's Office, of Springfield, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Barbara L. Jones, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:

A jury convicted Joseph Johnston (Johnston) of aggravated battery, mob action, and two counts of ethnic intimidation. The trial court sentenced Johnston to probation. On appeal, Johnston argues that: (1) the evidence was insufficient to convict Johnston; (2) Illinois' ethnic intimidation statute violates the due process and equal protection clauses of the fourteenth amendment and also violates the free speech provision of the United States Constitution; (3) Illinois' ethnic intimidation statute violates the State Constitution's due process and free speech provisions of article 1; (4) prosecutorial misconduct during discovery and the trial's opening and closing statements denied Johnston due process of law; and (5) the trial court committed reversible error by refusing to allow further redirect by Johnston after the prosecution's re-cross-examination. We affirm.

BACKGROUND

The State presented the testimony of complainants Joseph Weaver (Weaver) and Calvin McLin (McLin), two black youths who were 14 at the time of the incident. They testified that on August 15, 1989, they were picked up by two police officers while waiting for a bus home after attending a White Sox night baseball game. The officers took them to a nearby white residential neighborhood and ordered Weaver and McLin out of the police car, hitting them as they exited the vehicle. As Weaver and McLin began walking towards their homes, a group of white youths began throwing bottles at them. Weaver identified Johnston in court as being present in that group, and Weaver testified that he had previously identified Johnston in a police lineup.

Weaver and McLin ran away. The group of whites chased them and after a few blocks caught McLin, who was slowed down by a shoulder brace. During the chase, the group shouted things such as "Let's get those niggers" and "Niggers don't belong in our neighborhood." After catching McLin, about six boys kicked and hit him until he passed out. The group stopped chasing Weaver after catching McLin.

The next day, Officer Richard Epstein testified that he went to Johnston's home and asked if Johnston could come to the station and talk to him. Officer Epstein read Johnston his *Miranda* rights upon arrival, and Johnston agreed to speak with him. Johnston told him that the previous night he was in the company of a number of friends when someone yelled, "There are a couple of niggers on the block, let's get them." Officer Epstein testified that Johnston "told me he then began to chase after the crowd [which was] yelling, 'Let's get the niggers.' He told me he did not catch up with the crowd but

heard they had been knocked down, so he left." Johnston "said he ran after them. He was yelling, but he never caught up with them." When asked how Johnston referred to "them"—McLin and Weaver—Officer Epstein replied, "As niggers, shines."

Assistant State's Attorney Laura Lambur (Ms. Lambur) also interviewed Johnston later that evening. She took a statement from Johnston. Johnston read the statement, and then Lambur read it out loud, following which Johnston signed every page. The statement read by Ms. Lambur at trial was a summary of how Johnston recalled the incident to Ms. Lambur. The statement describes the incident as follows:

> "Joseph Johnston states on 15 August, 1989, he was hanging out on Union Street with his four friends Jimmy McQuen, Patrick Fitzpatrick, Rob Campbell, and Dan Bier when he noticed a beer can being thrown by Rob Campbell. Then he saw a friend John Boyd chasing two black kids. John Boyd yelled to Joseph Johnston and his friends, 'Help, help.' Johnston states he knows John Boyd meant help me get the black kids. Joseph states that his friends Fitzpatrick, Bier, and Campbell took off running to help John Boyd chase the black kids. Joseph says that he and Jimmy McQuen looked at each other and waited a second and then started running after their friends. Joseph states that some other neighborhood guys also started chasing the two black kids. Joseph said he knew that if the group caught the two black kids, they were going to beat them up. Joseph says he saw someone kick one of the black kids which made the black kid fall, and some of the group started kicking the kid after he fell. Joseph said he only watched the fallen black kid being beaten. Joseph said the other black kept running, and some of his friends chased that black kid. Joseph said Dan Bier yelled to Joseph to start running because the beaten black kid was hurt bad and passed out, and Joseph ran."

Ms. Lambur testified that the statement reflected what Johnston told her, but that she used her own words in the statement, including the replacement of Johnston's word "niggers" with "black kids" every time "black kids" appears in the statement.

Johnston testified on his own behalf. He explained that he chased after his friends, "Because I was concerned, I didn't want anyone to get hurt." Johnston stated he yelled to his friends, "Hey, come here, come here, no." Johnston also denied ever using the term "nigger" when talking to Officer Epstein or Ms. Lambur. On cross-examination, Johnston stated he saw a group of at least six people kicking McLin as he lay on the ground, did nothing to prevent them from hurting McLin, and that he ran home after the incident without running for

help or ever calling the police or an ambulance. Johnston also recalled telling the State's Attorney in his statement that Dan Bier yelled to him to start running because the beaten victim was hurt and had passed out. Johnston's re-cross-examination ended with the following colloquy:

"[The prosecutor]: Mr. Johnston, giving you back your handwritten statement, please take it. Would you please look at that and tell the ladies and gentlemen of the jury if anywhere in that statement that you signed that it says that you tried to stop your friends from attacking and beating these kids?

A. No, I do not.

Q. Did you tell the State's Attorney that?

A. I really don't remember."

Johnston also presented the testimony of Detective Jerome Rusnak, who stated he was present for the police lineup of Johnston and that neither McLin nor Weaver was able to identify Johnston.

Following trial, the jury found Johnston guilty of mob action, aggravated battery, ethnic intimidation against Calvin McLin, and ethnic intimidation against Joseph Weaver. The trial court sentenced Johnston to probation, ordered him to get his GED, and placed him on the sheriff's work program for four months. Johnston appeals.

OPINION

I

Johnston initially contends that the State did not prove any of the four counts beyond a reasonable doubt. Johnston argues the prosecution did not establish that he acted as either a principal or an accomplice, in that the prosecution was unable to prove beyond a reasonable doubt that Johnston did anything other than witness the incident and leave the scene. We disagree.

On review, a criminal conviction will not be set aside on the grounds of insufficient evidence unless the proof is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. (*People v. Stanciel* (1992), 153 Ill. 2d 218, 235, 606 N.E.2d 1201.) Determinations of the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence all lie within the jury's province (*People v. Peeples* (1993), 155 Ill. 2d 422, 487, 616 N.E.2d 294), even where inconsistencies exist. *People v. Aguilar* (1991), 218 Ill. App. 3d 1, 8, 578 N.E.2d 109.

Thus, the relevant inquiry in determining whether Johnston was proven guilty beyond a reasonable doubt is:

" 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Kitchen* (1994), 159 Ill. 2d 1, 25, 636 N.E.2d 433, 444, quoting *People v. Burrows* (1992), 148 Ill. 2d 196, 225.

In the instant case, we first examine the conviction for mob action:

"(a) Mob action consists of any of the following:
(1) The use of force or violence disturbing the public peace by 2 or more persons acting together and without authority of law." Ill. Rev. Stat. 1989, ch. 38, par. 25—1(a) (now 720 ILCS 5/25—1(a) (West 1993)).

■ If Johnston was part of a group engaged in physical aggression reasonably capable of inspiring fear of injury or harm, the requirements of the statute would be satisfied. (*People v. Simpkins* (1971), 48 Ill. 2d 106, 109, 268 N.E.2d 386.) A rational trier of fact could have convicted Johnston under this theory. Officer Epstein testified that Johnston admitted running after McLin and Weaver and yelling, but never catching up with them. Weaver identified Johnston as part of the group he had his initial confrontation with. And though Weaver's identification testimony is weakened by Detective Rusnak's testimony of Weaver's earlier failure to identify Johnston, Johnston himself testified that he was yelling and running after his friends who were chasing Weaver.

The trier of fact was not required to adopt Johnston's explanation of his actions at trial—that he was not chasing anyone, but instead was running after his friends because he was concerned and did not want anyone to get hurt. Johnston failed to mention this rationale either in his conversation with Officer Epstein or in his statement taken by Ms. Lambur describing the incident and his role in it. Johnston's use of racial epithets to describe McLin and Weaver to Officer Epstein and Ms. Lambur also casts some doubt on the benevolent motive Johnston claims he had while running towards Weaver and McLin. Although none of the epithets were recorded in the police reports, the failure to note a material fact in a police report is but a single credibility factor to be weighed by the trier of fact. (See *People v. Wydra* (1994), 265 Ill. App. 3d 597; *People v. Green* (1977), 54 Ill. App. 3d 596, 599, 370 N.E.2d 42.) Finally, a truly "concerned" Johnston might have called an ambulance after watching McLin get kicked by six or more boys and hearing McLin had passed out. The jury had an opportunity to form an opinion on the credibility of all the witnesses and to weigh the facts. We hold that a reasonable jury

could have found Johnston guilty of mob action beyond a reasonable doubt.

The statutory requirements for ethnic intimidation are:

"(a) A person commits ethnic intimidation when, by reason of the race, color, creed, religion or national origin of another individual or group of individuals, he commits assault, criminal trespass to residence, criminal trespass to real property or mob action as these crimes are defined in Sections 12—1, 19—4, 21—3 and 25—1 of this Code, respectively.

(b) Ethnic intimidation is a Class A misdemeanor; provided, however, that any person who commits ethnic intimidation as a participant in a mob action, as defined in Section 25—1 of this Code, which results in the violent infliction of injury to the person or property of another shall be guilty of a Class 3 felony." Ill. Rev. Stat. 1989, ch. 38, pars. 12—7.1(a), (b) (now 720 ILCS 5/12—7.1(a), (b) (West 1992)).

■ We first address the conviction on the felony count of ethnic intimidation against McLin through mob action. As discussed previously, there was enough evidence against Johnston to prove he committed mob action. The evidence also showed that racial animus was behind his actions. Johnston admitted that neither McLin nor Weaver did anything to promote the wrath of Johnston or his friends. Officer Epstein testified that Johnston admitted chasing after the "niggers," and he ran after the crowd which was yelling, "Let's get the niggers." Finally, the mob action did result in the violent infliction of injury upon McLin as required under the felony provision.

There was also enough evidence to convict on the misdemeanor count of ethnic intimidation against Weaver through assault. As stated above, the element of racial animus in Johnston's actions was present. In addition, Officer Epstein testified that Johnston admitted yelling and chasing after Weaver, actions which would have placed Weaver in reasonable apprehension of receiving bodily harm. We conclude that a rational trier of fact could have convicted Johnston of both counts of ethnic intimidation.

We last examine the aggravated battery count:

"(b) A person who, in committing a battery, commits aggravated battery if he ***:

* * *

(8) Is, or the person battered is, on or about a public way, public property or public place of accommodation or amusement." Ill. Rev. Stat. 1989, ch. 38, par. 12—4(b)(8) (now 720 ILCS 5/12—4(b)(8) (West 1992)).

The question in this case is whether there is sufficient evidence to link Johnston as an accomplice to those who physically administered the injuries to McLin. The statutory standard for accomplice liability is:

"A person is legally accountable for the conduct of another when:

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." Ill. Rev. Stat. 1989, ch. 38, par. 5—2(c) (now 720 ILCS 5/5—2(c) (West 1992)).

"Evidence that defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another." (*People v. J.H.* (1990), 136 Ill. 2d 1, 17, 554 N.E.2d 961.) A defendant may be found to have aided and abetted without actively participating in the overt act itself. (*Stanciel*, 153 Ill. 2d at 237.) A defendant's mere presence at the scene of the crime, even coupled with flight from the scene, is not enough to prove accountability. (*People v. Reid* (1990), 136 Ill. 2d 27, 61, 554 N.E.2d 174.) However, in determining guilt under a theory of accountability, the trier of fact may consider the defendant's presence during the commission of the crime, a continued close association with other offenders after the commission of the crime, the defendant's failure to report the incident, and the defendant's flight from the scene. *Reid*, 136 Ill. 2d at 61.

█ An examination of the evidence in the instant case shows there is sufficient proof of Johnston's accountability for the battery. Johnston voluntarily attached himself to the group causing the beatings. In his statement taken by Ms. Lambur, Johnston stated he saw his friend John Boyd call for his help while chasing the two kids, and that Johnston ran after his group of friends knowing they would beat up the kids if they caught them. Officer Epstein testified that Johnston admitted chasing McLin and Weaver, and that he ran after the crowd yelling, "Let's get the niggers." Thus, there was sufficient evidence that Johnston shared the common purpose of the group responsible for the injuries.

Moreover, the circumstances surrounding the beating lend support to Johnston's accountability. His statement indicates that he was close enough to the incident to watch McLin get beaten, and Johnston testified he recognized at least five of his friends who were taking part in the kicking. Johnston did nothing to stop the beating and fled from the crime scene with his friends. Finally, even after

watching this beating and getting told that McLin had been rendered unconscious, Johnston did not call for an ambulance or the police anytime that night. Based on this evidence, we cannot say that no rational trier of fact could have convicted Johnston as an accomplice. Rather, we find that a reasonable jury could have convicted Johnston of all four counts beyond a reasonable doubt.

## II

■ Johnston admits in his reply brief that his United States Constitution claims against the ethnic intimidation statute have been disposed of by the United States Supreme Court decision in *Wisconsin v. Mitchell* (1993), 508 U.S. 476, 124 L. Ed. 2d 436, 113 S. Ct. 2194. Nevertheless, Johnston's reply brief attempts to raise the issue that the statute violates the Illinois Constitution of 1970 in article 1, sections 2 and 4 (Ill. Const. 1970, art. I, §§ 2, 4). However, Johnston cites neither any language of article I, any court decisions, nor any legislative history to support his contention, and we find no support for a theory that the Illinois Constitution grants the scope of protection Johnston seeks to nullify this statute. A statute carries a strong presumption of constitutionality, and the burden is on the party challenging it to establish its constitutional invalidity. (*Messenger v. Edgar* (1993), 157 Ill. 2d 162, 176, 623 N.E.2d 310.) That burden was not met in this case.

## III

The defense next argues that prosecutorial misconduct in discovery and the opening and closing arguments constituted reversible error. The State contends that Johnston has waived these issues by failing to raise them in his post-trial motion or by failing to address the alleged errors with enough specificity. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) Arguably, Johnston has waived all these issues. However, we will consider these matters.

■ Addressing the discovery issue, the defense first contends that Weaver's surprise in-court identification of Johnston denied him due process of law. However, the Illinois Supreme Court in *People v. Mahaffey* (1989), 128 Ill. 2d 388, 418, 539 N.E.2d 1172, held that the prosecution must disclose a witness' oral statements only if they are in memoranda containing substantially verbatim reports. Thus, because the claimed damage occurred from alleged unreported oral statements of Weaver to the prosecutors concerning identification, no disclosure was required and Johnston's claim must fail. Moreover, Johnston was afforded substantial protection against the "unreliable" identification testimony through cross-examination and the direct impeachment evidence of Detective Rusnak.

Johnston also objects to several remarks by the prosecution in its opening and closing statements. Improper remarks generally do not constitute reversible error unless they result in substantial prejudice to the accused. (*People v. Coleman* (1994), 158 Ill. 2d 319, 348-349, 633 N.E.2d 654.) " '[T]he prosecutor is allowed a great deal of latitude in making his opening and closing argument. *** Although the prosecutor's remarks may sometimes exceed the bounds of proper comment, the verdict must not be disturbed unless it can be said that the remarks resulted in substantial prejudice to the accused, such that absent those remarks the result would have been different.' " *Coleman*, 158 Ill. 2d at 347, quoting *People v. Pasch* (1992), 152 Ill. 2d 133, 184-85, 604 N.E.2d 294.

In opening statements, the prosecution is allowed to comment on what the expected evidence will be and reasonable inferences therefrom. (*People v. Cloutier* (1993), 156 Ill. 2d 483, 507, 622 N.E.2d 774.) Johnston objected to the following statement in the opening:

"Just like a pack of wolves goes after a deer. All the wolves participate in dragging and slowing, wearing that deer out."

Following the objection, the judge admonished the prosecutor: "Counsel, please just limit your opening statement to what the evidence will prove, please."

■ We agree with Johnston that the remark was improper. Any analogy, much less one involving animal imagery, is inappropriate because it cannot precisely match what the prosecutor's statements should be limited to—the evidence in the case and the logical inferences that can be drawn from it. We agree with the Illinois Supreme Court in *Peeples*, in which the prosecution referred to the defendant as a "human predator" in its opening statement, that " '[t]his court has repeatedly disapproved of similar remarks [citations], but has generally declined to reverse without some indication that they have resulted in substantial prejudice to the accused.' " (*Peeples*, 155 Ill. 2d at 482, quoting *People v. Spreitzer* (1988), 123 Ill. 2d 1, 39, 525 N.E.2d 30.) Moreover, this case is also identical to *Peeples* in that:

"the jury was at least twice instructed that opening statements are not evidence and that the jury should disregard any statement not based on the evidence. Thus, any alleged error resulting from this remark was cured." (*Peeples*, 155 Ill. 2d at 482.

In addition, the judge admonished the counsel at that time to avoid arguments not based on evidence, a directive which helped cure prejudicial error at that time. (*People v. Page* (1993), 156 Ill. 2d 258, 276, 620 N.E.2d 339.) Thus we also agree with *Peeples'* conclusion: "We do not find any substantial prejudice to defendant." (*Peeples*, 155 Ill. 2d

at 482.) The "harmful tone" Johnston alleges resulted is not sufficient to meet the burden of substantial prejudice against Johnston.

We next address the errors Johnston alleges occurred in closing argument. The first cited is that the prosecutor referred to a report by Detective Rusnak not in evidence (although accidentally misstated as Epstein's by Johnston). However, the record reveals the prosecutor was merely reviewing Rusnak's procedures:

"Detective Rusnak was one of the detectives that investigated a case that involved very many offenders. And his reports tried to detail all of the identifications made."

Moreover, Rusnak's report was referred to in three different questions by Johnston's counsel on direct examination of Rusnak. The prosecutor was permitted to comment on this evidence.

The next errors Johnston cites are these two sentences by the prosecutor:

"What he [Johnston] told the State's Attorney was that his pal Dan Bier is now running back screaming the kid is hurt bad, he is knocked out, get out of here. He is telling you I don't need your help any more let's get out of here and he books."

Johnston complains that the evidence did not show that Dan Bier was Johnston's friend, nor that Johnston left because he was no longer needed because McLin was already hurt. However, Johnston's own statement to Assistant State's Attorney Lambur does state that Dan Bier was among Johnston's three friends who took off running with John Boyd to chase the black kids. As to the second sentence, the prosecutor made this inference directly from the statement to Johnston referred to in the first sentence. This allowed the jury to immediately conclude whether they agreed the inference was justified. We find no error in these two statements.

■ Finally, Johnston contends that several references to race and racial backgrounds in the closing argument inflamed the jury and were reversible error. We disagree. This case was clearly about race, and two of the counts directed against Johnston required proving Johnston's actions were based on race. Where the prosecutor strayed too far away from the evidence, the trial court properly sustained several objections. "Therefore, where defendant has not shown that the remarks of the prosecutor were so prejudicial and improper that they could not be cured by an admonition to the jury, no grounds exist upon which to vacate his sentence." (*Page*, 156 Ill. 2d at 276.) The trial court is in a better position than a reviewing court to determine the prejudicial effect of a remark made in closing argument, and absent a clear abuse of discretion, its ruling should be upheld. (*Peeples*, 155 Ill. 2d at 483.) Nor was it improper for the

prosecutor to refer to the white lady who sheltered McLin when McLin described in his testimony his waking up on the white lady's porch. We find no substantial errors of any kind in the prosecutor's closing argument. Even if some small error had occurred, the trial court specifically instructed the jury that closing arguments are not evidence and that any statement not based on evidence was to be disregarded (*Coleman*, 158 Ill. 2d at 349), substantially curing any error which may have occurred. *Page*, 156 Ill. 2d at 276.

■ In addition, Johnston claims that the cumulative effect of the errors constituted reversible error. It is true that trial errors may have a cumulative effect when considered together. (*People v. Albanese* (1984), 102 Ill. 2d 54, 83, 464 N.E.2d 206.) However, we agree with the *Albanese* court:

> "The whole can be no greater than the sum of its parts, and defendant has failed to demonstrate anything approaching reversible error in the myriad of arguments offered to justify a new trial." (*Albanese*, 102 Ill. 2d at 82-83.)

Nor did any errors in the instant case justify a reversal of the jury's verdict.

## IV

Lastly, Johnston contends the court committed reversible error by not allowing further redirect in response to re-cross-examination. After the prosecution on re-cross-examination reiterated that Johnston did not help McLin or call an ambulance or police after the beating, Johnston wished to have another redirect to establish he did not know the extent of the victim's injuries.

The scope of redirect is within the sound discretion of the trial court, and its ruling will not be disturbed on review unless there has been clear abuse of discretion resulting in manifest prejudice to the defendant. (*People v. Crisp* (1992), 242 Ill. App. 3d 652, 658, 609 N.E.2d 740.) We find that neither abuse of discretion nor manifest prejudice occurred in this instance.

■ The trial judge was correct when he responded to Johnston's request by saying, "I think it is clear what he knew and what he did not know." Johnston testified that he remembered telling the State's Attorney that he saw the victim get kicked to the ground and then get kicked by several people in a large group. In his statement, Johnston admitted that his friend had told him to start running because the victim was hurt badly and had passed out, and Johnston told Officer Epstein he had heard that a victim was unconscious. Finally, in cross-examination Johnston agreed that he had seen a group of more than five people beating McLin. Thus, Johnston's

contention that he could rehabilitate himself by testifying he did not know that McLin was hurt is simply not credible. Moreover, nothing unique was raised on re-cross-examination, as the cross-examination established that Johnston had both seen the beating and had not called the police or an ambulance after the incident. It was not abuse of discretion for the trial court to conclude the jury had sufficient information on what Johnston knew as to the status of the victim, and that no new material on this subject was raised in re-cross-examination in any event.

For the foregoing reasons, we affirm.

Judgment affirmed.

MURRAY, P.J., and GORDON, J., concur.