SIXTH DIVISION
March 18, 2011

No. 1-07-2758

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County |
| | ) | |
| v. | ) | No. 04 CR 18035 |
| | ) | |
| JUAN RODRIGUEZ, | ) | Honorable |
| | ) | Diana Gordon Cannon, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CAHILL delivered the judgment of the court, with opinion
Justice McBride concurred in the judgment and opinion.
Justice R.E. Gordon dissented, with opinion.

Defendant Juan Rodriguez was found guilty by a jury of the first degree murder of David Reyes, the aggravated battery with a firearm of Rosendo Diaz, and aggravated discharge of a firearm. He was sentenced to consecutive terms of 50, 6 and 6 years' imprisonment. He argues on appeal that: (1) the trial court deprived him of his right to a fair trial when it denied his motion *in limine* to bar the State from using a juvenile adjudication as impeachment; (2) the trial court deprived him of a fair trial when it gave the jury a certified copy of this adjudication but not copies of convictions of the State's witnesses; (3) the State did not prove him guilty beyond a reasonable doubt; (4) his mittimus should be amended to reflect an additional 4 days of sentencing credit and that he was sentenced to a single 50-year term of imprisonment for first degree murder; and (5) the trial court's failure to strictly comply with Supreme Court Rule 431(b) (Ill. S. Ct. R. 431(b) (eff. May 1, 2007)) requires reversal and remand for a new trial. We affirm.

Before trial, defense counsel filed a motion *in limine* to bar the State from using as impeachment defendant's juvenile adjudication of aggravated unlawful use of a weapon.

Jury selection began on August 14, 2007. The court read the charges to the venire *en masse* and admonished them that defendant is presumed innocent of the charges against him and that the State has the burden of proving defendant guilty beyond a reasonable doubt. The court then admonished the first panel of prospective jurors:

"Should the State meet their burden of proof beyond a reasonable doubt is there anybody seated in the jury box who could not or would not follow the law as I gave it to you that governs the case, go back into the jury room with your fellow jurors and sign a verdict form of guilty?"

One juror expressed concern about her ability to reach a decision but said she would follow the law. The court continued:

"Anybody else who could not or would not follow the law, if the State met their burden of proof, sign [a] verdict form of guilty?

No response.

Should the State fail to meet their burden of proof beyond a reasonable doubt, is there anyone seated in the jury box who could not or would not follow the law that governs this case, go back into the jury room with your fellow jurors and sign a verdict form of not guilty?

No response."

The court and attorneys then asked general questions of the potential jurors. At the end of

questioning, the court admonished the potential jurors:

> "Ladies and gentlemen, the defendant in the case has a right to testify. He also has a right to remain silent, not testify. Should he exercise that right, is there anybody who would hold that against him?
>
> No response."

Five jurors were selected from that panel. The court admonished the second panel of prospective jurors in the same way it admonished the first panel. Seven jurors and one alternate were selected from that panel. The court admonished the third panel of prospective jurors in a similar fashion. One alternate was selected from the third panel. Neither defense counsel nor the prosecutor objected to the method of selection or asked the court to inquire further in accordance with Rule 431(b).

Defendant's convictions arose from the June 27, 2004, shooting of Reyes and Diaz as they drove with friends to a nightclub. At trial, Virginia Rojas testified that about midnight on that date, she was with Dean Villera, her boyfriend at the time, and five of his friends, driving to a nightclub in Ford City. Rojas said she was riding in the middle passenger seat of Villera's pickup truck, Villera was driving and Ernest Villa was in the passenger seat. Aside from Raul Rivera, Rojas did not know the three other persons, which included Reyes and Diaz, seated in the bed of the truck.

As the group headed west on 59th Street, they stopped for a traffic light at the intersection of Pulaski Road. Rojas testified she saw about five boys standing in front of a house to her right. She heard them arguing with Villera's friends in the bed of the truck. As they did so, she saw

defendant emerge from a gangway on the side of the house. She heard three gunshots before Villera pushed her head down and drove away. She said that although it was dark outside, there were streetlights in the area and she was able to see defendant's face as he walked out of the gangway.

Villera's truck was stopped by an unmarked police car a few blocks from the scene of the shooting. Rojas accompanied police to the station at 51st Street and Wentworth Avenue where she identified defendant in a lineup as the shooter. She also identified defendant at trial. Rojas testified that she was familiar with defendant and recognized him because she had met him at a party sometime before the shooting, and he had helped her after some girls "jumped" her.

On cross-examination, Rojas acknowledged that her observations of the shooting were made within a "second or two." She also acknowledged she did not see a gun in defendant's hand or see him shoot at anyone. She said she was only able to recognize defendant from the group of people standing in front of the house because she knew who he was.

Diaz testified that he was convicted of aggravated unlawful use of a weapon in 2004 and that he was a member of the Satan Disciples street gang, who were rivals of the Saints gang. He said that on the date of the shooting he was seated in the bed of Villera's pickup truck along with Luis Torres, Reyes and Rivera, all of whom were also Satan Disciples. At the intersection of 59th Street and Pulaski Road, Diaz saw about five persons, including defendant, standing on the passenger side of the truck in front of a house. The groups began to yell "gang slogans" at each other and exchange "gang [hand] signs." As they did so, defendant ran toward the house. Diaz could not remember if defendant returned from the house before the shooting.

4

After the groups yelled and exchanged gang signs, an "older man" appeared on the passenger side of the truck and asked Diaz to leave. At that time, Diaz felt his face get warm and heard about four gunshots. He was subsequently treated at Christ Hospital for a gunshot wound to his left cheek. After leaving the hospital, he went to the police station at 51st Street and Wentworth Avenue, where he identified defendant in a lineup as the person he saw running away from the scene.

Diaz acknowledged that on the date of the shooting, he provided Assistant State's Attorney (ASA) Fred Sheppard with a signed handwritten statement in which he said he saw defendant return from the gangway on the side of the house with his right hand under his shirt as if he were holding a gun. He also acknowledged that about two weeks after the shooting, he testified in front of a grand jury that he saw defendant return from the gangway "with his hands under his shirt." He further testified in front of the grand jury that he "didn't see the gun, but [defendant] had his hand under his shirt" and he "thought [defendant] was going to shoot." Diaz admitted he did not know if defendant was the shooter.

On cross-examination, Diaz said that before leaving for the nightclub, he, Villera, Villa and Torres were at a block party, drinking. Diaz said he had between three and six drinks at the party and was legally drunk. He acknowledged he did not see a gun in defendant's hand or anyone shooting, and that, at the time of his testimony, he could not remember if defendant returned from the gangway because he did not "remember a lot of things from that night." He also said he was not on medication when he gave his statement to ASA Sheppard and that he believed he was not free to leave the police station until he gave a statement.

5

Torres testified he was convicted of aggravated unlawful use of a weapon in 2002 and aggravated unlawful use of a weapon by a felon in 2003. Torres said that at the time of the shooting, he was a member of the Satan Disciples street gang and was seated in the bed of Villera's pickup truck along with Diaz, Reyes and Rivera. At the intersection of 59th Street and Pulaski Road, Torres saw about five persons, including defendant, standing in front of a house on the passenger side of the truck. Torres identified defendant in open court. The groups exchanged gang slogans and gang signs. As they did so, defendant ran into a gangway. A short time later, a bald-headed man came out of the house, followed by defendant. The man yelled at Torres "don't start [any] problems" and asked him to leave. Torres then heard a gunshot and looked at defendant. Torres said he saw defendant with his arms extended in front of him and sparks coming from his hands. He heard the sound of breaking glass. The group then sped away westbound on 59th Street. As they did so, Torres noticed Diaz was bleeding from his left cheek and Reyes was "leaning down" with blood on the right side of his back.

The group was stopped by an unmarked police car a few blocks from the scene of the crime. Torres spoke with an officer about the shooting and accompanied the officer back to the scene. Torres and several officers went to the backyard of the house where the shooting occurred. Torres identified defendant there as the shooter. He testified there were other young Hispanic men in the backyard but only defendant had long hair and a teardrop tattoo by his eye. Torres then went to the police station at 51st Street and Wentworth Avenue, where he spoke with detectives about the shooting and identified defendant from a lineup as the shooter.

On cross-examination, Torres acknowledged that at the time of the shooting, he was on

6

mandatory supervised release for his conviction of aggravated unlawful use of a weapon. He said that, as a member of the Satan Disciples, he hated the Saints street gang and its members. A girl had told him previously that a member of the Latin Kings street gang lived on the block near the intersection of 59th Street and Pulaski Road. That member had long hair and a teardrop tattoo. Torres acknowledged that when the truck pulled up to that intersection, he was looking for someone who fit that description. When he saw about five persons standing in front of a house near the intersection, he told Reyes, Diaz and Rivera "look at them Kings right there." The groups then began to argue. Torres said he hated the Latin Kings and the man he was looking for because he believed him to be a member of the gang. He said his attention was drawn to defendant as he exited the gangway because Torres was looking for a person matching defendant's description and because he assumed that defendant ran to the back of the house to get a gun. Torres acknowledged he did not see a gun in defendant's hands.

The parties stipulated that, if called, Detective Jean Romic would testify she interviewed Torres a couple hours after the shooting and he did not inform her that defendant ran into a gangway next to his house or that he assumed he did so to retrieve a gun.

Assistant Medical Examiner Dr. Michelle Jorden of the Cook County medical examiner's office testified as an expert witness. She said she reviewed an autopsy report prepared by Dr. Aldo Fusaro, who was no longer employed with the Cook County medical examiner's office. An examination of Reyes' body showed a gunshot wound to the mid-back. Dr. Jorden concluded Reyes died as a result of this wound and the manner of death was homicide.

The parties stipulated that Chicago police officers John Kaput and Thomas Slowinski

administered a gunshot residue test on defendant. Samples of residue were collected from defendant's right and left hand then placed into a sealed evidence envelope and inventoried.

Forensic scientist Ellen Connolly of the Illinois State Police's forensic science center testified as an expert witness. She said she analyzed the gun shot residue samples collected by Kaput and Slowinski. Connolly determined the residue samples collected from defendant's left hand contained three unique particles that showed defendant discharged a firearm, contacted gunshot residue or was in the presence of a discharged firearm. On cross-examination, Connolly explained that a person could test positive for gunshot residue by coming into contact with a recently fired weapon. She also said there is a possibility a person can get gunshot residue particles on his hand if he is standing within three feet of the weapon when it is fired.

Before the State rested its case-in-chief, defense counsel renewed his motion to bar the State from using as impeachment defendant's juvenile adjudication for aggravated unlawful use of a weapon. Counsel argued that in *People v. Montgomery*, 47 Ill. 2d 510, 268 N.E.2d 695 (1971), our supreme court adopted Federal Rule of Evidence 609 (51 F.R.D. 391 (1971)), which prohibits the use of juvenile adjudications for purposes of impeachment when the witness is the accused. Counsel also cited to *People v. Kerns*, 229 Ill. App. 3d 938, 595 N.E.2d 207 (1992), in which the Fourth District Appellate Court held that the admissibility of a juvenile adjudication is governed by Federal Rule 609 as adopted in *Montgomery*. Alternatively, counsel argued that the probative value of the adjudication was outweighed by its prejudicial effect on the jury. The State responded that after *Kerns* was decided, section 5-150(1)(c) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5-150(1)(c) (West 2004)) was amended to allow the use of juvenile

8

adjudications for purposes of impeachment against the accused.

In denying defendant's motion, the court noted it considered the facts of the case and found that the probative value of the adjudication outweighed its prejudicial effect. The court pointed out that defendant was allowed to "spread to the jury" the State witnesses' convictions for unlawful use of a weapon and that it would be improper "to now say that *** the jury is not allowed to hear about [his adjudication]."

The State rested. Defendant moved for a directed verdict. The trial court denied the motion.

Martin Rodriguez, defendant's father, testified on defendant's behalf. On the date of the shooting Rodriguez was at his house at 3940 West 59th Street, drinking beer in the backyard with his friend Alexea Gutierrez. Defendant was in the basement of the home with his friend Saul Harrera. About midnight, defendant's friend Shaid Frausto and his cousin Juan Garcia arrived at the house and joined defendant and Harrera in the basement. About 20 minutes later, the group exited the house and walked toward the front yard where Garcia's car was parked. Rodriguez said he could see the front of his house from the backyard and that, as the group made its way to Garcia's car, he saw a truck with about six people inside drive past the group. Someone in the truck began yelling "gang words" at defendant. Defendant and his friends yelled back. Rodriguez's friend Gutierrez went to the front of the house and told the people inside the truck he did not want any problems.

Rodriguez testified he walked to the front of the house to help Gutierrez. As he did so, he saw someone shove Garcia. Garcia then ran to his car, opened the trunk and retrieved a gun.

Garcia walked to the curb and began shooting. Rodriguez said he saw Garcia fire the gun once and heard four more gunshots as Garcia ran toward the street. Defendant was "close by" when Garcia shot.

After the shooting, defendant, Harrera, Frausto and Garcia ran inside the house. Rodriguez testified he told defendant to ask Garcia to leave because "he had caused problems." Rodriguez saw Garcia leave the house with a gun in his hand shortly afterward. About five minutes later, police officers came to the backyard and placed Rodriguez, Gutierrez, Fausto, Harrera and defendant against a garage. Defendant was arrested after a boy with the police pointed to him. Rodriguez said the police did not allow him to speak to them that night.

On cross-examination, Rodriguez admitted his son was a member of the Saints street gang. He said he did not tell the responding officers that he saw Garcia shoot at the truck because they yelled at him and did not allow him to talk.

Gutierrez testified that as defendant, Harrera, Frausto and Garcia walked toward Garcia's car, a black pickup truck pulled up in front of the house. The people in the bed of the truck started "throwing up [gang] signs" and the two groups began to argue. Gutierrez saw some of the boys exit the bed of the truck so he ran to the front of the house and asked them to leave. One of the boys "ripped off" Garcia's necklace. Defendant then ran toward the back of the house while Garcia removed a gun from the trunk of his car and began shooting. Gutierrez said defendant was behind him during the shooting. After he heard about five shots, Gutierrez ran to the backyard. A few minutes later, police arrived on the scene with one of the boys who was in the truck. The boy pointed out Gutierrez, Harrera and defendant to the officers, who transported

10

them to the police station at 51st Street and Wentworth Avenue. Gutierrez said Garcia left the house before police arrived.

On cross-examination, Gutierrez said defendant ran to the back of the house before Garcia removed the gun from the trunk of his car and started shooting. He said that when the shooting started, defendant attempted to return to the front yard, but Gutierrez held him back. Garcia tried to hand the gun to defendant after the shooting, but defendant did not take it. Garcia then left the backyard, carrying the gun. Gutierrez acknowledged he spoke to a detective a few hours after the shooting and did not inform her that Garcia was the shooter.

Defendant testified in his own behalf. He said he was a member of the Saints street gang and that they were rivals of the Satan Disciples. On the date of the shooting, he was in the basement of his house with his friend Harrera. About midnight, Garcia and Frausto came to the basement. The group left the basement about 15 minutes later and walked to Garcia's car, which was parked in front of defendant's house. Defendant denied being in possession of a gun and said he did not see Harrera, Garcia or Frausto with a gun.

As defendant stood by the rear passenger side of Garcia's car, he saw a dark pickup truck with about five boys in the bed of the truck stop near the car. The boys exited the truck and began yelling at defendant. When one of them yelled "get the guy with the tear drop" tattoo, defendant ran into the gangway near his house. As he did so, Gutierrez stopped him and asked him "what [was] going on." Defendant then followed Gutierrez to the front of the house, where the yelling continued. He denied retrieving a gun from the gangway before returning to the front yard. He saw one of the boys "snatch" Garcia's necklace and Garcia retrieve a gun from the

11

trunk of his car. Defendant said he saw Garcia run past him on the sidewalk and shoot. After hearing the first shot, defendant stepped back into the gangway and heard additional shots as Garcia ran toward the street.

Defendant testified that Garcia tried to hand the gun to him after the shooting, asking him to hide it. Defendant refused, pushed the gun away with his hand and told Garcia to leave. Garcia eventually left the house. Defendant was identified in the backyard by "one of the guys [who] jumped out of the truck" and arrested. Defendant said he was right handed.

On cross-examination, defendant initially testified that he spoke with detectives after the shooting and told them that he saw Garcia shoot at the truck. He then said that he heard the gunshots when he entered his house. The following colloquy then took place:

"[THE STATE]: So, you didn't tell [the detectives] that you saw Juan Garcia do the shooting?

[DEFENDANT]: No.

[THE STATE]: You didn't tell them that you were standing right there?

[DEFENDANT]: No. Just I saw what he did. I just didn't want to get him in trouble. I lied, but I didn't want to get him in trouble. After what I seen, what I did I didn't want to see him get in trouble."

Defendant acknowledged he spoke to detectives shortly after the shooting and did not tell them he saw Garcia retrieve a gun from the trunk of his car and shoot at the pickup truck. Defendant also acknowledged he did not inform the detectives that, after the shooting, Garcia repeatedly tried to hand him the gun and he pushed it away.

The State introduced a certified copy of defendant's 2003 juvenile adjudication for aggravated unlawful use of a weapon. The trial court admitted the adjudication into evidence over defense counsel's objection.

Detective Romic testified in rebuttal for the State. Romic interviewed Gutierrez on the date of the shooting. Gutierrez did not tell Romic he saw Garcia shoot at the truck or that he held defendant back as Garcia shot. Romic also said she had a conversation with defendant on the same date and he did not tell her he saw Garcia shoot at the truck or that Garcia tried to hand him the gun afterward.

During deliberations the jury sent a note to the trial judge, asking for the certified copy of defendant's juvenile adjudication. Defense counsel objected but asked the court if it did allow the jury to see the adjudication, the copy read "adjudicated guilty" of aggravated unlawful use of a weapon. The court reviewed the certified copy of adjudication and explained:

"THE COURT: First page, January 6th, 2003. Second page is he is adjudicated ward of the court. We can redact that.

First page, second page is the order of probation. The third page is juvenile detention ordered. And more of a sentencing.

I am inclined to just send the first page back which has the charges. And if you want to add to the first page adjudication of guilty. We will just send that page back with the charges on it."

Counsel also asked the court to provide the jurors with the certified copies of the State's witnesses' convictions. In refusing to do so, the court noted "if they asked for them, I would give

13

them." The court then provided the jurors with a redacted copy of defendant's juvenile adjudication, listing the charges against him and that he was "adjudicated" delinquent of aggravated unlawful use of a weapon.

After further deliberations, the jury found defendant guilty of first degree murder and that he personally discharged the firearm that proximately caused the death of Reyes. The jury also found defendant guilty of aggravated battery with a firearm and aggravated discharge of a firearm.

At sentencing, the trial court denied defendant's motion for a new trial. The court noted that it stood by its ruling to admit defendant's juvenile adjudication for purposes of impeachment after finding it more probative than prejudicial. The court also noted that defendant's adjudication was redacted as defense counsel requested and that, had the jury asked, the court would have provided it with the certified copies of the State's witnesses' convictions. The court then merged "counts 5 and 6" (first degree murder) and sentenced defendant to 50 years' imprisonment for that offense. The court also imposed two six-year terms for aggravated battery with a firearm and aggravated discharge of a firearm to be served consecutively to each other and the murder sentence.

We first address defendant's contention that he was denied his right to a fair and impartial jury because the trial judge failed to question the prospective jurors about the four principles set forth in *People v. Zehr*, 103 Ill. 2d 472, 469 N.E.2d 1062 (1984), and codified in Supreme Court Rule 431(b). Defendant claims that the trial court failed to ask the potential jurors whether they understood or accepted the principle that: (1) he was presumed innocent; (2) the State was required to prove him guilty beyond a reasonable doubt; (3) he was not required to present

14

evidence; and (4) his failure to testify cannot be held against him. Defendant maintains that the trial court's error requires automatic reversal. The State does not dispute that the trial court failed to strictly comply with Rule 431(b) but responds that the court's substantial compliance with the rule does not warrant automatic reversal.

This issue is controlled by our supreme court's decision in *People v. Thompson*, 238 Ill. 2d 598, 939 N.E.2d 403 (2010). See also *People v. Magallanes*, 397 Ill. App. 3d 72, 921 N.E.2d 388 (2009). We first note that defendant forfeited review of the issue by failing to object to it at trial or raise it in a timely filed posttrial motion. *Thompson*, 238 Ill. 2d at 611-12 (citing *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988)). As suggested in *Thompson*, "[a] simple objection would have allowed the trial court to correct the error during *voir dire*." *Thompson*, 238 Ill. 2d at 612. Although under the plain-error rule defendant may bypass normal forfeiture principles, he has failed to show the evidence is so closely balanced that the error threatens to tip the scales of justice against him or the error has affected the fairness of his trial and challenged the integrity of the judicial process. *Thompson*, 238 Ill. 2d at 612-14. The plain-error doctrine does not provide a basis for relaxing defendant's forfeiture of this issue.

We next address defendant's challenge to the sufficiency of the evidence. When a defendant challenges the sufficiency of the evidence to sustain a conviction, it is not the function of the reviewing court to retry the defendant. *People v. Evans*, 209 Ill. 2d 194, 209, 808 N.E.2d 939 (2004). The reviewing court must decide whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *Evans*, 209 Ill. 2d at 209. We will not reverse a conviction

15

unless the evidence is so unreasonable, improbable or unsatisfactory that it raises a reasonable doubt of the defendant's guilt. *Evans*, 209 Ill. 2d at 209.

Here, defendant argues that the State failed to prove him guilty beyond a reasonable doubt because he presented the testimony of three eyewitnesses, including himself, who testified Garcia was the shooter. He claims that the physical evidence and the testimony of all but one of the State's witnesses was consistent with Garcia being the shooter. Defendant maintains that the State's only evidence against him was the testimony of Torres, a twice-convicted felon and member of a rival gang.

Viewed in the light most favorable to the prosecution, we find the evidence sufficient to support a guilty verdict. The record shows that Rojas, Diaz and Torres identified defendant as one of the persons who shouted at them as they drove to a nightclub. Rojas, Diaz and Torres each described defendant as having long hair and a teardrop tattoo under his left eye. Rojas testified she was familiar with defendant because she had met him at a party sometime before the shooting. She said she saw defendant emerge from a gangway on the side of the house in front of which he was standing and then heard three gunshots. Diaz testified that on the date of the shooting he provided an assistant State's Attorney with a signed handwritten statement in which he said he saw defendant emerge from the gangway with his hands under his shirt. Torres said he looked at defendant after hearing the first gunshot and saw him standing with his arms extended and sparks coming from his hands. Torres identified defendant as the shooter at the scene, from a lineup and at trial. Defendant's left hand also tested positive for gunshot residue.

Defendant's challenge to the sufficiency of the evidence essentially asks us to substitute

16

our judgment for that of the jury on credibility and resolve the conflicts in the evidence in his favor. This we cannot do. See *Evans*, 209 Ill. 2d at 211 (it is the function of the trier of fact, and not the reviewing court, to assess the credibility of witnesses, determine the appropriate weight of the testimony and resolve conflicts or inconsistencies in the evidence). In reaching its verdict, the jury heard the evidence and inconsistencies defendant relies on to support his sufficiency argument, including the testimony of defendant, defendant's father and Gutierrez that Garcia was the shooter. The jury was also made aware that Torres, who identified defendant as the shooter, was a twice-convicted felon and member of a rival gang. As the trier of fact, the jury is in a superior position to this court to assess witness credibility (*People v. Adams*, 394 Ill. App. 3d 217, 232, 914 N.E.2d 490 (2009)), and " 'may believe as much or as little as it pleases of a witness's testimony' " (*People v. Mejia*, 247 Ill. App. 3d 55, 62, 617 N.E.2d 799 (1993) (quoting *People v. Beasley*, 54 Ill. App. 3d 109, 114, 369 N.E.2d 260, 264 (1977)). Given the verdict, it is clear the jury found Torres more credible than defendant, defendant's father and Gutierrez. The matters raised by defendant in this case were not of such character as to raise a reasonable doubt of his guilt.

In reaching this conclusion, we have considered the discrepancies in the testimony of the State's witnesses. Defendant asserts that the "testimony from the majority of the State's eyewitnesses was at best inconclusive as to the identi[t]y of the shooter." He claims that Rojas and Diaz were unable to identify him as the shooter and that at trial Diaz could not remember if defendant emerged from the gangway.

Discrepancies, omissions and bias go to the weight of the testimony to be evaluated by the

17

trier of fact. *People v. Mendoza*, 62 Ill. App. 3d 609, 616-17, 378 N.E.2d 1318 (1978). As mentioned, we will not substitute our judgment for that of the jury. A single witness's identification of the accused is sufficient to sustain a conviction if, as here, the witness viewed the accused under circumstances permitting a positive identification. *People v. Slim*, 127 Ill. 2d 302, 307, 537 N.E.2d 317 (1989).

We also find unpersuasive defendant's argument that no physical evidence linked him to the shooting. Gunshot residue was found on defendant's left hand. Although defendant testified that he is right handed and that he pushed the gun away with his left hand when Garcia tried to hand it to him, the jury was free to reject this self-serving testimony. See *People v. Johnston*, 267 Ill. App. 3d 526, 532, 641 N.E.2d 898 (1994). This aside, lack of physical evidence and minor inconsistencies do not render the evidence so unreasonable, improbable or unsatisfactory to justify reversal of the jury's determination. See *People v. Wheeler*, 401 Ill. App. 3d 304, 312, 929 N.E.2d 99 (2010); *People v. Berland*, 74 Ill. 2d 286, 305-06, 385 N.E.2d 649 (1978).

Defendant next argues that the trial court erred in denying his motion *in limine*, seeking to bar the State from using as impeachment his juvenile adjudication. The determination of whether an earlier conviction is admissible for impeachment purposes is within the discretion of the trial court, and a reviewing court may overturn a trial court's decision only when the record demonstrates the court abused that discretion. *People v. Harris*, 231 Ill. 2d 582, 588, 901 N.E.2d 367 (2008).

Here, defendant claims that the trial court had no discretion to deny his motion because *Montgomery* adopted Federal Rule 609 (51 F.R.D. 391 (1971)), which prohibits the admission of

juvenile adjudications for purposes of impeachment when the witness is the accused. The State responds that under section 5-150(1)(c) of the Act (705 ILCS 405/5-150(1)(c) (West 2004)), as amended, defendant's juvenile adjudication was admissible for purposes of impeachment and the trial court properly exercised its discretion in finding that it was more probative than prejudicial.

We note that there is a split of authority among the districts of this court on the application of the *Montgomery* rule. In *People v. Bond*, 405 Ill. App. 3d 499 (2010) (4th Dist.), the defendant argued that his trial counsel was ineffective for eliciting inadmissible impeachment testimony from him regarding his two prior juvenile adjudications. *Bond*, 405 Ill. App. 3d at 504. The court rejected defendant's ineffectiveness claim based on the trial court's ruling denying his motion *in limine* to bar the use of his adjudications. *Bond*, 405 Ill. App. 3d at 505-06. The court in *Bond* then considered the underlying issue whether the trial court erred in denying defendant's motion *in limine*. In concluding that it erred, the *Bond* court found that section 5-150(1)(c) of the Act is limited by Rule 609, which does not permit impeachment of a testifying defendant with a juvenile adjudication. *Bond*, 405 Ill. App. 3d at 508.

In *People v. Villa*, 403 Ill. App. 3d 309, 319-20, 932 N.E.2d 90 (2010), *appeal allowed*, 237 Ill. 2d 586, 938 N.E.2d 529 (2010), the Second District found that the defendant was properly impeached with his prior juvenile adjudication because he opened the door to this impeachment by attempting to mislead the jury during his testimony. The *Villa* court based its conclusion on the defendant's testimony that the statement he gave to police was false because he was scared during his interrogation since he had " 'never been in a situation like that before.' " (Emphasis omitted.) *Villa*, 403 Ill. App. 3d at 313.

Both *Bond* and *Villa* must be read in light of our supreme court's decision in *Harris*, 231 Ill. 2d 582, which we believe refines the rule in *Montgomery*. In *Harris*, the supreme court found that the trial court did not err in allowing the State to introduce certified copies of the defendant's prior juvenile adjudications for purposes of impeachment because the defendant's testimony attempted to mislead the jury about his criminal history. *Harris*, 231 Ill. 2d at 590-91 (the defendant's direct testimony that he " '[does not] commit crimes' " opened the door to his impeachment on cross-examination).

In reaching their conclusions, both the *Bond* and *Villa* courts acknowledged the supreme court's decision in *Harris*, albeit differently. In *Bond* the court made a passing reference to *Harris* after concluding that "criminal defendants who choose to testify ordinarily may not be impeached by their prior juvenile adjudications." *Bond*, 405 Ill. App. 3d at 508. The court in *Villa*, on the other hand, relied on *Harris* to support its conclusion that, despite the apparent conflict between *Montgomery* and section 5-150(1)(c) of the Act, the defendant's adjudication was admissible because he opened the door to its use. *Villa*, 403 Ill. App. 3d at 318-19. As in *Villa*, there is no need for us to address any conflict between *Montgomery* and section 5-150(1)(c) because we find the adjudication admissible under the *Harris* analysis.

On cross-examination, defendant first testified that he spoke with detectives after the shooting and told them that he saw Garcia shoot at the truck. He then said that he heard the gunshots when he entered his house. The following colloquy took place:

"[THE STATE]: So, you didn't tell [the detectives] that you saw Juan Garcia do the shooting?

[DEFENDANT]: No.

[THE STATE]: You didn't tell them that you were standing right there?

[DEFENDANT]: No. Just I saw what he did. I just didn't want to get him in trouble. I lied, but I didn't want to get him in trouble. After what I seen, what I did I didn't want to see him get in trouble."

As explained in *Harris*, the "pivotal question" for admissibility is whether the defendant testified in a manner that may reasonably be construed as an attempt to mislead the jury. *Harris*, 231 Ill. 2d at 590-91. The supreme court said:

"[D]efendant submits that this answer was merely 'a present tense statement of how he conducts his life' that was never meant to 'falsify or misstate his juvenile record.' And perhaps this is true. But it is just as reasonable to construe defendant's answer as a comprehensive denial of ever having engaged in criminal activity, which amounts to an outright lie. This is clearly how both the trial court and appellate court majority perceived it, and at oral argument before this court, even defense counsel conceded that 'it's a close question.' Given this reality, we have no basis for disturbing the trial court's conclusion that defendant was attempting to mislead the jury, as it was in a far better position than we are to assess the meaning of defendant's testimony. Accordingly, we conclude that the trial court's decision allowing the State to impeach defendant with evidence of his prior juvenile adjudications was not an abuse of discretion." (Emphasis omitted.) *Harris*, 231 Ill. 2d at 591.

21

1-07-2758

Given the contradiction in defendant's testimony and his acknowledgment that he lied, it is not unreasonable to assume that defendant attempted to mislead the jury. See *Harris*, 231 Ill. 2d at 590-91; *Villa*, 403 Ill. App. 3d at 319-20. Accordingly, we find defendant opened the door to his impeachment and the trial court did not abuse its discretion in allowing the State to impeach him with evidence of his juvenile adjudication. *Harris*, 231 Ill. 2d at 591; *Villa*, 403 Ill. App. 3d at 318-19

In reaching this conclusion, we note that although the trial court determined that defendant's juvenile adjudication would be admissible for impeachment purposes even before he testified, we may affirm the court's decision on any basis supported by the record. *Villa*, 403 Ill. App. 3d at 319.

Defendant next contends that the trial court deprived him of a fair trial when it gave the jury a certified copy of his juvenile adjudication but not copies of the convictions of the State's witnesses. Defendant claims that by doing so the court improperly highlighted this impeachment evidence against him at the expense of that against the State's witnesses.

It is within the trial court's discretion to determine how best to respond to a jury question and we review the court's response for an abuse of discretion. *People v. Averett*, 381 Ill. App. 3d 1001, 1012, 886 N.E.2d 1123 (2008). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Hall*, 195 Ill. 2d 1, 20, 743 N.E.2d 126 (2000).

Here, we find the trial court's response allowing the jury to view the certified copy of defendant's juvenile adjudication did not amount to an abuse of discretion. The record shows that

22

during deliberations the jury asked to view the adjudication which had been admitted into evidence. Following an *in camera* discussion with defense counsel and the State, the court overruled defendant's objection to the adjudication being sent to the jury but agreed with counsel's suggestion that details of the facts surrounding the adjudication, plea, admissions, sentence imposed and defendant's time in custody be redacted from the document. The court also agreed with counsel's suggestion that the document read defendant was "adjudicated guilty," rather than "found guilty," of aggravated unlawful use of a weapon. Given this record, we cannot say the trial court's ruling was arbitrary, fanciful or unreasonable.

We are unpersuaded by defendant's argument that the trial court's response to the jury question improperly highlighted this evidence because the court did not also provide the jury with certified copies of convictions of the State's witnesses. The trial court's response need not go further than the question posed by the jury. See *Averett*, 381 Ill. App. 3d at 1015 (citing *People v. Sanders*, 368 Ill. App. 3d 533, 538, 857 N.E.2d 948 (2006)). Here, the jury did not request to view the certified copies of convictions of the State's witnesses.

We are also unpersuaded by defendant's argument that the jury used his adjudication as substantive evidence of his guilt. At the end of trial the jury was instructed to consider the adjudication only as it may affect defendant's believability as a witness and not as evidence of his guilt. The jury is presumed to follow the instruction given by the court. *People Taylor*, 166 Ill. 2d 414, 438, 655 N.E.2d 901 (1995).

Defendant finally contends, and the State agrees, that his mittimus should be amended to reflect four additional days of sentencing credit and a single conviction of first degree murder

23

because there was one victim and the two convictions were based on the same physical act. See *People v. King*, 66 Ill. 2d 551, 565-66, 363 N.E.2d 838 (1977).

A defendant is entitled to credit for time he spent in custody before sentencing. See 730 ILCS 5/5-8-7(b) (West 2006). The record shows defendant was in custody from the date of his arrest on June 27, 2004, until the day he was sentenced, September 13, 2007, for a total of 1,173 days. Because the mittimus erroneously reflects defendant was in custody for 1,169 days it must be corrected. See *People v. Miller*, 363 Ill. App. 3d 67, 80-81, 842 N.E.2d 290 (2005). The record also shows defendant was found guilty of one count of first degree murder. But the mittimus erroneously reflects defendant's conviction of two counts of first degree murder and must be amended. *People v. Peeples*, 155 Ill. 2d 422, 496, 616 N.E.2d 294 (1993).

By our authority under Supreme Court Rule 615(b)(1) (Ill. S. Ct. R. 615(b)(1) (eff. Aug. 27, 1999)), we vacate defendant's less culpable conviction for murder under section 9-1(a)(2) of the Criminal Code of 1961 (Code) (count VI) (720 ILCS 5/9-1(a)(2) (West 2004)) (*People v. Smith*, 233 Ill. 2d 1, 20, 906 N.E.2d 529 (2009)). We order the clerk of the circuit court to amend the mittimus to reflect: (1) defendant's single conviction for first degree murder under section 9-1(a)(1) of the Code (count V) (720 ILCS 5/9-1(a)(1) (West 2004)) (*People v. Lee*, 213 Ill. 2d 218, 226-27, 821 N.E.2d 307 (2004)) and (2) 1,173 days of credit, the correct number of days defendant spent in custody before sentencing. *People v. McCray*, 273 Ill. App. 3d 396, 403, 653 N.E.2d 25 (1995).

We affirm the judgment of the trial court and correct defendant's mittimus.

Affirmed; mittimus corrected.

24

1-07-2758

JUSTICE ROBERT E. GORDON, dissenting:

In this case defendant had a 2003 juvenile adjudication for aggravated unlawful use of a weapon. Slip op. at 13. The majority finds that our Illinois Supreme Court instructed us in *Harris* that the " 'pivotal question' " for admissibility is whether the defendant testified in a manner that may reasonably be construed as an attempt to mislead the jury, and if that is the case the instruction of a juvenile adjudication is allowed. Slip op. at 21 (quoting *Harris*, 231 Ill. 2d at 590-91).

I read *Harris* to mean that a juvenile adjudication is allowed only when defendant attempts to mislead the jury about his criminal background because that is what it says. The "pivotal question" is whether the defendant was "attempting to mislead the jury about his criminal background." *Harris*, 231 Ill. 2d at 590. In *Harris*, the defendant was attempting to mislead the jury at an armed robbery trial when he testified, " 'I don't commit crimes.' " *Harris*, 231 Ill. 2d at 591. In this case, defendant was not attempting to mislead the jury about his criminal background.

The Illinois Supreme Court instructed us in *Harris* that as a general rule it is improper to cross-examine a defendant about a prior juvenile conviction unless the "defendant opens the door to such cross-examinations." *Harris*, 231 Ill. 2d at 592 (citing *People v. Coleman*, 158 Ill. 2d 319, 337 (1994)). "[T]he pivotal question in this case is this: When defendant testified that 'I don't commit crimes,' was he attempting to mislead the jury about his criminal background? If he was, then he 'opened the door' and the trial court was well within its discretion to allow the admission of defendant's prior adjudications for purposes of impeachment. If he was not, then defendant's testimony was not a proper basis for the admission of evidence." *Harris*, 231 Ill. 2d at 590.

25

1-07-2758

The majority interprets *Harris* as permitting the introduction of a juvenile adjudication so long as a defendant was attempting to mislead the jury about anything, without any regard to the topic about which he or she was allegedly trying to mislead. Slip op. at 22 (issue is whether it was "not unreasonable to assume that defendant attempted to mislead the jury"). Interpreting *Harris* so broadly creates the classic exception that swallows the rule. If a defendant testifies, the State will always argue that the defendant was attempting to mislead the jury about something, and that the defendant has then opened the door to his or her juvenile adjudications.

Since I would not broaden *Harris* to include any time when a defendant allegedly misleads the jury, I must respectfully dissent.