2024 IL App (1st) 210907-U

No. 1-21-0907

THIRD DIVISION
March 13, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | No. 04 CR 18035 |
| v. | ) | |
| | ) | Honorable |
| JUAN RODRIGUEZ, | ) | Diane Gordon Cannon, |
| | ) | Adrienne E. Davis, |
| Defendant-Appellant. | ) | Judges, Presiding |

JUSTICE D.B. WALKER delivered the judgment of the court.
Justices Mikva and Van Tine concurred in the judgment.

**ORDER**

*Held*: We affirm the circuit court's order denying defendant relief on his postconviction petition. We correct the mittimus to reflect that defendant's 6-year sentence for aggravated battery with a firearm and 5-year sentence for aggravated discharge of a firearm are to run concurrently with one another, and consecutively with his 21-year sentence for first-degree murder.

¶ 1      Defendant Juan Rodriguez appeals from the Circuit Court of Cook County's order denying him the relief requested in his post-conviction petition. Following a jury trial, defendant was convicted of first-degree murder, aggravated battery with a firearm, and

aggravated discharge of a firearm in connection with the August 11, 2004 murder of David Reyes and shooting of Rosendo Diaz. Defendant filed an initial post-conviction petition on August 29, 2013. After revision, defendant's post-conviction petition alleged that he was actually innocent, multiple constitutional violations, and an error in sentencing. The circuit court conducted a third-stage evidentiary hearing and subsequently denied the petition. Defendant asserts on appeal that the circuit court erred in denying him a new trial and that the resentencing court erred in determining his sentence. We affirm the circuit court's decision and correct the mittimus.[1]

¶ 2                                                    I. BACKGROUND

¶ 3                                                A. Undisputed Facts

¶ 4          It is undisputed that at about 12:30 a.m. on June 27, 2004, a black pickup truck traveling westbound on 59th Street arrived at the intersection with Pulaski Road and stopped a few car-lengths back from the traffic light there. The truck was driven by Dean Valera. Riding in the cab were Ernest Villa in the passenger seat and Virginia Rojas in the middle. Seated in the bed of the truck were Rosendo Diaz, David Reyes, Raul Rivera, and Luis Torres. Everyone in the truck except Rojas was a member of the Satan Disciples gang. The truck's position three or four car-lengths from the intersection placed it in front of a yard where four Hispanic males were standing. The men in the yard were Shaid Frausto, Juan Garcia, Saul Herrera, and defendant. The two groups exchanged words, gang signs, and gang slogans, as it became apparent that the men in the yard were members of a rival gang, the Saints. At some point during this exchange, someone in the yard discharged a firearm multiple times.

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

Rosendo Diaz was struck in the cheek, while David Reyes was struck in the back and killed. Beyond these core facts, the facts of this case are largely disputed.

¶ 5                                B. Pretrial

¶ 6        Defendant moved to suppress Torres' lineup identification. At a pretrial hearing on the motion, defendant asserted that he was the only member of the lineup that matched the description of "long hair, male Hispanic, with a tear drop" and therefore the lineup was impermissibly suggestive. The State argued in response that the participants in the lineup were made to wear handkerchiefs "so that the hair for the most part was covered," and that the participants were all of approximately the same height and age. The State asserted that the teardrop was "one of the least noticeable things about everybody in that lineup." Defendant argued in response that the fact that even those witnesses who were unable to give a description picked defendant demonstrates that his teardrop tattoo rendered the lineup impermissibly suggestive. The trial court concluded that the lineup was not "overly suggestive" and denied the motion.

¶ 7                                C. Trial

¶ 8        The State argued at trial that defendant was the shooter, while defendant asserted that it was Juan Garcia who fired the shots that night.

¶ 9                              1. Luis Torres

¶ 10       Torres testified that he had attended a block party earlier in the night with Diaz, Villa, and Valera. After leaving that party, the four went and picked up Reyes and Rivera, followed by Rojas. Torres believed that only Villa had begun drinking before the group left the block party. The group of seven was heading to a club when they stopped at the intersection of 59th and Pulaski. Torres testified that four or five men were gathered near a car parked on the

street on the passenger side of the truck, including defendant, who he noted to have had long hair at the time. Those men initiated the exchange by "[throwing] down the pitchfork," which is to say displaying the symbol of the Satan Disciples upside-down to show disrespect. An exchange of gang signs and slogans followed.

¶ 11        Torres testified that after the initial exchange ended, defendant "yelled something" and ran into the gangway beside the house in front of which the group had been standing. Torres lost sight of defendant. During that time, the exchange of "yelling and hand signs" continued and a "bald headed gentleman came out" and began yelling at the people in the truck to not cause any problems. Torres testified that he was trying to tell the bald-headed man that they were leaving, at which time defendant returned to the yard and Torres heard the first gunshot. Torres stated: "I looked towards him again and I just seen sparks coming." Torres saw the sparks from in front of defendant while defendant had his hands extended forward and held together in front of him. Immediately after this first gunshot, Torres felt glass hit his elbow, and he ducked down into the bed of the truck as the truck sped away.

¶ 12        As the truck was leaving the area, Torres noticed that Diaz was bleeding from his cheek and Reyes was slumped over, unresponsive, and bleeding from the back. As they were fleeing, Torres noticed a police car in pursuit with its emergency lights activated. Valera pulled the truck over and a plain clothes officer approached with his weapon drawn. The occupants of the truck explained that their friends had been shot and the officer called for backup. Two of the officers went back with Torres to the house where the shooting took place. Upon seeing defendant, Torres identified him as the shooter. Torres confirmed that defendant was the only long-haired individual present when he and the police returned, as well as the only individual present with a teardrop tattoo. Torres went with the police to the

police station and viewed a lineup, in which he identified two of the five individuals in the lineup, defendant and Alexea Gutierrez, the so-called "bald headed man" who had asked the people in the truck not to cause trouble. Later testimony from Detective Michael Hughes established that Torres identified a third individual in the lineup, Herrera, as present in the yard at the time of the shooting. Torres was also shown an array of photographs in which he identified Garcia as one of the people in the group on the sidewalk. Torres testified that he had not seen any of the three identified individuals holding a gun, but had only seen sparks coming from in front of defendant's hands at the time of the shooting.

¶ 13    Torres testified on cross-examination that he had been told by someone that a King (a rival gang member) with long hair and a teardrop tattoo lived at the house where the shooting unfolded. Torres also stated that after he and others from the truck were at the police station, they were put in a room together. Torres testified on redirect examination that he did not speak with anyone else in the truck about the identity of the shooter in the time between when the truck sped away and when he viewed the lineup and photo array.

¶ 14                                2. Virginia Rojas

¶ 15    Rojas, who was seated in the cab of the truck, also testified that the truck arrived at the light, four or five men were standing in the yard, and an argument ensued. She saw defendant, whom she recognized from meeting him once previously at a party, coming from the gangway next to the house where the truck was stopped. Valera then pushed Rojas down in her seat and she heard three gunshots. Rojas picked the defendant out of a lineup on the night of the shooting and also identified defendant in court as the person she saw coming into the front yard from the side of the house just before she heard shots.

5

¶ 16                                    3. Rosendo Diaz

¶ 17        Diaz, who was in the back of the truck, testified similarly to Torres as to the events leading up to the verbal confrontation and the content of the confrontation. Diaz identified defendant in court as one of the people he saw in the yard. He saw defendant run in the direction of the gangway beside the house. He said an older man was present and was yelling that he did not want trouble. Diaz stated that while the older man was yelling, he felt his face get very warm on the left side. Diaz confirmed that although he could not recall it clearly at the time of his testimony, he did previously testify to a grand jury that he saw defendant with his hand under his shirt at his waist, as if to draw a weapon, though he never saw a gun. He realized he was bleeding and heard "like four" gunshots as the truck sped away. After the truck was stopped by the police, Diaz was taken to the hospital by ambulance. He was later taken to Chicago Police Department's Area 1 with the others from the truck. Diaz confirmed that all of the people from the truck were placed in the same room and had an opportunity to talk about what happened before the lineup occurred. He denied, however, that anyone discussed the shooter's name, clothing, hairstyle, tattoos, description, or identity prior to the lineup. Diaz identified defendant in the lineup as the person who ran toward the gangway. He identified Gutierrez as also present.

¶ 18                                    4. Ernest Villa

¶ 19        Villa, who was sitting in the passenger seat of the truck, testified similarly to Torres about the events leading up to the arrival of the truck at the intersection of 59th and Pulaski. He testified that while the truck was at the light, he glanced over and saw four or five men in the yard next to the truck. After he stopped looking in that direction, he heard arguing and a bottle breaking behind him, followed by gunshots. The truck pulled away and was pulled

over shortly afterward, at which point he saw that Reyes and Diaz had been shot. Villa made no identifications.

¶ 20                                     5. Sergeant David Berglind

¶ 21          Sergeant David Berglind testified that at the time of the shooting, he was in plain clothes in an unmarked police car stopped facing southbound at the intersection of Pulaski and 59th. While stopped at the intersection, he heard gunfire to his left and saw the "reflection of muzzle fire" before seeing "a dark pickup truck leave the scene quickly as the light was changing heading westbound on 59th Street." Berglind's testimony from this point corroborated Torres' testimony: he pursued the truck, ascertained the situation, and having identified Torres as a cooperative witness, held him to the side until another car arrived.

¶ 22                                     6. Officer Robert Marshall

¶ 23          Officer Robert Marshall testified that he arrived at the scene where Officer Berglind had stopped Valera's truck after Officer Berglind put out a "shots fired" call. Officer Marshall subsequently left the scene with Torres and two other officers to return to the location where the shooting had taken place in search of the shooter, who Torres had described as having "longer black hair with a teardrop under his left eye." Upon arriving at the house in front of which the shooting took place, Marshall and the other officers went to the back yard and conducted field interviews with those present, none of whom had long hair or a teardrop tattoo. While the officers were conducting those interviews, defendant emerged from the back door of the house and was placed under arrest.

¶ 24                                     7. Officer Mark Cunningham

¶ 25          Officer Mark Cunningham testified that he was one of the officers who responded to the call from Berglind. He was sent to Christ Hospital with Reyes and Diaz, who were shot. He

was able to speak with Diaz. Though he did not testify as to the content of their conversation, Cunningham stated that after the conversation, he advised his fellow officers to be on the lookout for "a male Hispanic with a teardrop underneath his left eye and long hair, a male Hispanic bald headed, and a male Hispanic with glasses."

¶ 26                                8. Detective Michael Hughes

¶ 27        Detective Michael Hughes testified that he was assigned to investigate the case and was in the room with the witnesses that morning as they viewed the lineup. He testified that the individuals in the lineup were all men who had been brought from the scene of the crime. Torres identified defendant as the shooter, as well as Gutierrez and Herrera as individuals present at the scene. Rojas identified defendant as the person she saw running toward the truck from the gangway. Diaz identified defendant as the person holding the gun. Villa did not identify anyone. Rivera and Valera also viewed the lineup, but Hughes gave no testimony as to whether they identified anyone or not.

¶ 28        On cross-examination, Hughes testified that the individuals in the lineup were dressed in do-rags and similar clothing in the lineup. He stated that although he did not make the choice to put them in do-rags for this lineup, it was a procedure he would regularly use when the individuals in the lineup had differing hair lengths.

¶ 29                                9. Ellen Connolly

¶ 30        The parties established via stipulation that a gunshot residue test was conducted on defendant's hands at about 2:00 a.m. on the day of the shooting. Testimony from forensic scientist Ellen Connolly established that defendant tested positive for gunshot residue on his left hand and while he had residue on his right hand, the amounts were insufficient to constitute a positive result. Connolly testified that residue could indicate that an individual

fired a firearm, that they were within about three feet to either side or within eight feet in front of a firearm when it discharged, or that the person came into contact with a surface that had gunshot residue on it.

¶ 31                                    10. Martin Rodriguez

¶ 32        Martin Rodriguez (Martin), defendant's father, testified that on the night of the shooting, he was at his home, where the shooting took place and where defendant also lived. Martin and Gutierrez were in the backyard. Martin was aware that defendant had friends over, namely Frausto, Garcia, and Herrera. After midnight, defendant, Frausto, Garcia, and Herrera left through the front door and proceeded toward Garcia's car, which was parked at the curb. Martin testified that a dark-colored pickup truck carrying about six people passed in front of the house and the people in the truck started yelling "gang words" back and forth with the four men in the front yard. Gutierrez went to the front yard, got in between the two arguing groups, and yelled at those in the truck that he did not want any problems.

¶ 33        As Martin was walking to the front yard, he saw one of the men in the truck push Garcia. Garcia then ran to the trunk of the car parked at the curb, retrieved a gun, and fired four shots at the people in the truck. As Garcia shot, "everyone started running toward the back," including defendant. Afterward, both Garcia and defendant ran into the house. Martin and defendant both told Garcia to leave. Garcia left with the gun still in his hand. Martin was talking to Gutierrez in the back yard, asking him what happened and why there was shooting, when the police arrived about five minutes later. The police told those in the yard, consisting of Martin, Frausto, and Gutierrez, not to move, and had them stand against the wall of the garage. Martin testified: "[The police] put us against the garage and they didn't let us say anything. He said, shut the fuck up." The police then brought Herrera and defendant from

9

inside the home and lined them up as well. A civilian was brought into the back yard and identified defendant, Frausto, and Herrera. Defendant, Frausto, and Herrera were then arrested and removed from the yard. The police searched the house for an additional half an hour and then departed. Martin was not asked about any interview that may have occurred the morning of the shooting, but testified that he went to the police station around 5:00 p.m. the same day to speak with detectives and gave them all of the same information contained in his testimony.

¶ 34    On cross-examination, Martin testified that Garcia was about four feet away from Gutierrez and defendant when he fired the first shot, and that he did not see, but only heard the other three shots. When the police arrived, Martin did not say anything to them about Garcia being the shooter or anything else about what had happened because the police yelled at them to not speak.

¶ 35                            11. Alexea Gutierrez

¶ 36    Gutierrez's testimony was largely consistent with Martin's. Gutierrez testified that after the two groups had been yelling at one another and he had arrived to tell the men in the truck to leave, those in the back of the truck jumped out of the truck. One of the men from the back of the truck "ripped off the chain of Juan Garcia." At that point in time, defendant ran back toward the back of the house. Garcia then produced a gun from the trunk of his car. Defendant attempted to return to the front yard, but Gutierrez did not let him pass. Garcia began "shooting shots like crazy." Gutierrez ran to the back yard. Gutierrez testified consistently with Martin that the police arrived soon after and would not let them speak.

¶ 37    On cross-examination, Gutierrez testified that when the groups were arguing, they were all in front of him and he was not in fact separating the groups from one another. He stated

10

that he was still at the curb, but backing toward the back yard, along with "everybody else," and pulling out his phone to call the police when Garcia started shooting. He testified that defendant, Herrera, and Martin were all three attempting to come to the front just before and as Garcia started shooting, but that Gutierrez physically held them back and warned them not to come out. Gutierrez also stated that he was only telling them to stay back and was not physically blocking them. Gutierrez testified that the first shot was fired from behind Garcia's car and then Garcia "passed right in front of" him. After the shooting, Martin, Gutierrez, defendant, Frausto, Garcia, and Herrera were in the back yard. Martin yelled at Garcia to leave, and Garcia left with the gun in hand.

¶ 38    After the shooting, around 3:45 a.m., Gutierrez spoke to police at the station, but did not name Garcia as the shooter. When confronted with whether Gutierrez had told the police a different story about hearing shots and seeing defendant run into the house, he stated that he had given that information to police, but it was because he was scared, stating: "they were gang members. I was panicking."

¶ 39    On redirect examination, Gutierrez testified that Garcia tried to hand off the gun to defendant, but defendant did not take it from him. Gutierrez did not specify where this attempt to hand off the weapon took place.

¶ 40                      12. Defendant Juan Rodriguez

¶ 41    Defendant took the stand in his own defense. He testified to the same events leading up to the shooting that Martin described. When defendant and his friends were standing by Garcia's car, the dark truck passed by and stopped in front of the house. Defendant testified that one of the men in the back of the truck, who wore a basketball jersey, yelled to "get the guy with the teardrop," at which point defendant ran toward the gangway next to the house.

11

When defendant reached the gangway, he encountered Gutierrez, who, after defendant informed him about what was going on, continued toward the front. Defendant stated that he returned to the front yard seconds later. Upon returning to the front yard, he saw Gutierrez yelling at those in the truck. The man in the jersey and one other in the back of the truck jumped out of the truck. The other man started walking toward defendant, but turned and started to return to the truck after Gutierrez physically blocked his way. The man in the jersey approached Garcia and "snatch[ed] something off his neck." Garcia then went to the trunk of his car and retrieved a gun. Garcia ran past defendant and Gutierrez and fired one shot. Defendant began to back away and, once he saw Garcia run toward the street, he turned and ran toward the gangway. Defendant heard additional shots as he ran to the back yard.

¶ 42    All of the others from the front yard arrived in the back yard shortly thereafter. Defendant told Garcia to leave. Garcia attempted to hand off the gun to defendant, "pushing it toward [him]." Defendant refused and pushed the gun away with his hand. Garcia went into the house to the basement and defendant followed. Garcia again tried to hand off the gun, defendant again pushed it away with his hand. Garcia left and defendant did not see where he went. The police arrived shortly thereafter, entered the home, and arrested defendant.

¶ 43    On cross-examination, defendant denied that any of the men in the front yard yelled at the men in the truck or made any sort of gang representations. Defendant testified that when Garcia began shooting, defendant was standing next to Gutierrez with no others nearby. When questioned as to Frausto's whereabouts and Herrera's whereabouts at that moment, he stated that he did not remember. Defendant's testimony on what he told police after being taken to the police station was mixed. He stated that he told them what happened, but they did not want to listen. Then he stated he did not tell the officers questioning him that Garcia

was the shooter. He stated that he was not aware that he was being charged at that time and that he did not want to get Garcia in trouble. On redirect examination, he stated that he initially withheld the truth because he did not want to get Garcia in trouble, but later told the officers about Garcia's involvement.

¶ 44                                    13. Detective Jean Romic

¶ 45        Detective Jean Romic testified that on the day of the shooting, she spoke with Martin and Gutierrez, and in neither conversation did they mention various specific details included in the version of events that they testified to at trial. On cross-examination, Romic testified that Martin did state that Garcia was the shooter at the time of her interview with him.

¶ 46                                    14. Detective John Yniguez

¶ 47        Detective John Yniguez testified that he was present during Romic's interview with defendant and worked on the case with Romic and a third detective, Michael Hughes. During the interview, defendant did not state that he saw Garcia shoot at the truck. Neither did defendant state that Garcia attempted to pass the gun off to him. Yniguez further stated that he did not subsequently learn from any source that defendant had made statements implicating Garcia as the shooter or asserting that Garcia attempted to hand off the gun to him.

¶ 48                                      15. Nicole Tewell

¶ 49        Nicole Tewell testified that she is defendant's half-sister and was watching television in the front room of the house at the time of the shooting. She was alone in the house and heard gunshots outside. She testified that the house also contained two dogs that would bark when non-family members entered the house alone, including Garcia. She testified that about five minutes after the gunshots, she heard the back door open, but she did not hear anyone

13

descend into the basement, nor did she hear the dogs bark. After she heard the back door open, defendant and Herrera entered the room and sat down on the sofa. On cross-examination, Nicole stated that she does not remember where the dogs were while she was watching television, and that it was normal to lock the dogs in one of the rooms of the house at times.

¶ 50                                    16. Conviction

¶ 51    Following closing arguments and deliberation, the jury found defendant guilty of first-degree murder and both counts of aggravated battery with a firearm. Defendant was sentenced to 50 years' imprisonment for first-degree murder, six years' imprisonment for aggravated battery with a firearm, and six years' imprisonment for aggravated discharge of a firearm to be served consecutively, for a total of 62 years' imprisonment. Defendant appealed.

¶ 52                                    D. Direct Appeal

¶ 53    Defendant filed a direct appeal that this court heard in *People v. Rodriguez*, 408 Ill. App. 3d 782 (2011). In that appeal, defendant argued (1) that he was denied his right to a fair and impartial jury because the trial court failed to appropriately question the prospective jurors; (2) that the evidence presented was insufficient to support his conviction; (3) that the trial court erred in denying his motion *in limine* to bar the State from introducing defendant's juvenile adjudication for impeachment purposes; (4) that the trial court deprived him of a fair trial when it provided a certified copy of defendant's juvenile adjudication to the jury, but not copies of the convictions of the State's witnesses; (5) that his mittimus should be corrected to reflect four additional days of sentencing credit and a single conviction of first degree murder. *Id.* This court agreed with defendant regarding the mittimus and adjusted it

accordingly. *Id*. This court otherwise affirmed the trial court's judgment. *Id*. One justice dissented, asserting that the trial court erred by allowing the introduction of defendant's juvenile adjudication. *Id*.

¶ 54    Our supreme court exercised its supervisory authority to direct this court to vacate and reconsider its judgment in light of *People v. Villa*, 2011 IL 110777, to determine if another result was warranted. *People v. Rodriguez*, 960 N.E. 2d 563 (2012). *Villa* concerned the introduction of a juvenile adjudication for impeachment purposes. *Villa*, 2011 IL 110777. This court found that the introduction of defendant's juvenile adjudication was improper, but that the introduction was harmless error. *People v. Rodriguez*, 2012 IL App (1st) 072758-B, ¶ 59. The same justice again dissented, opining that he would find that the State did not meet its burden to establish harmless error. *Id.* ¶ 84.

¶ 55                              E. Post-Conviction Proceedings

¶ 56    On August 16, 2013, defendant filed a *pro se* post-conviction petition. After passing to the second stage, defendant filed the amended post-conviction petition that is of concern in this appeal on June 13, 2018. In his petition, defendant raised claims of actual innocence, ineffective assistance of both trial and appellate counsel, multiple violations under *Brady v. Maryland*, 373 U.S. 83 (1963), and that his sentence was unconstitutional under *Miller v. Alabama*, 567 U.S. 460 (2012). The State answered the petition and it advanced to a third-stage evidentiary hearing. The hearing commenced June 12, 2019, and testimony was heard from seven witnesses.

¶ 57                                  1. Dr. Deryn Strange

¶ 58    Dr. Deryn Strange was called first to testify as an expert witness. Dr. Strange testified that she was at that time a tenured professor at John Jay College of Criminal Justice, who

worked primarily as a research psychologist focused on studying false memories and the ways in which memories can be corrupted or distorted. Dr. Strange was offered as an expert in the area of "reliability of eyewitness identification, specifically under the umbrella of memory distortion." Dr. Strange explained memory as a process that can be broken down into three stages: encoding, storage, and retrieval.

¶ 59     Dr. Strange testified that there were a number of issues in this case that she believed would cause issues with an accurate encoding of the event. First, the streetlights were likely dim enough to interfere with the encoding process, and it is "simply improbable that [defendant's teardrop tattoo] could have been visualized from a distance given those lighting conditions." Second, in instances where there are multiple potential perpetrators, the attention of a witness tends to be split and that leads to more mistakes in identification. Since there were several men in the yard who were potential perpetrators, that likely affected the witnesses' identifications. Third, people who have had two or more drinks tend to narrow their focus of attention such that they have poor recollection of information beyond "essential details" and are more subject to outside suggestion regarding their memory after the fact. Some of the witnesses had been drinking at the time of the shooting.[2] Fourth, stress tends to further narrow focus to those things the individual needs to most focus on, for example a weapon, "at the expense of peripheral information," such as the face of the person holding the weapon. In this case, the event being recalled was stressful. Fifth, a short period of exposure to a face can lead to unreliable identification, and the events surrounding the

[2]     The testimony as to who had been drinking is mixed and conflicting. Diaz, Gutierrez, and Martin all testified that they had imbibed alcohol near to the time of the shooting, though only Diaz mentioned that he was significantly intoxicated. Villa stated that he and Valera drank "a couple of beers" at a baseball game earlier in the day, but did not partake further as the evening went on. Diaz stated that Torres, Valera, and Villa were also drinking, but did not recall how much.

shooting happened very quickly. Sixth, post-event information, such as discussing the event with another witness after the event, can influence a witness' recollection of the event and lead to that witness being unable to distinguish between what they actually saw and what they heard from the other witness. In this case, the witnesses in the truck were put in the same room prior to making their identifications, so it is possible that each was exposed to post-event information from the others during that time.

¶ 60        Dr. Strange identified a number of issues that she believed could have interfered with the process of recollection in this case: First, feedback of any kind from the officers conducting the lineup could have influenced the witnesses. Second, if any individual in the lineup stood out from the others in any way, that would likely bias the witnesses. In this case, defendant was the only member of the lineup with a teardrop tattoo, with visible hair and wearing the clothing described by one of the witnesses. Third, if the lineup procedure was conducted by an officer who believed they knew who the perpetrator was, that officer could, purposely or not, lead witnesses to identify the person they believed to be the perpetrator. In this case, Dr. Strange interpreted the affidavit provided by Joel De Luna, who was one of the men in the lineup, to state that "it was the detectives who were pointing out the suspect." Fourth, threats from officers toward witnesses would impact the reliability of their identification of suspects.

¶ 61        Lastly, Dr. Strange testified that there is zero correlation between a witness' confidence that their identification is accurate and the actual accuracy of the identification. A witness' pre-identification confidence that he or she can correctly identify the perpetrator can correlate with accuracy if none of the previously-mentioned complications are present. Dr. Strange's ultimate conclusion is that one or more of the enumerated factors likely impacted the witnesses' identifications in this case. On cross-examination, Dr. Strange confirmed that she

had only read the record and had not spoken to any of the witnesses in this case. Dr. Strange confirmed that she cannot be certain that an error occurred here and that all of her testimony regarded generalizations, not what was or was not actually witnessed in this case.

¶ 62                                    2. Saul Herrera

¶ 63        Herrera testified to his version of the events around the shooting. Herrera's timeline of events leading up to the arrival of the truck was largely in line with defendant's testimony at trial, aside from the fact that Herrera estimated that he left the house with defendant, Garcia, and another individual at about 11:15 or 11:30. Herrerra testified that after the truck stopped in front of the house, the people in the truck left the truck and approached Herrera and the others in the yard. One of them said "that's the dude with the teardrop." At that point, defendant ran toward the backyard and the same person who had mentioned the teardrop "snatched something from Juan Garcia's neck." An older man, whom Herrera did not recognize came to the front yard from an unspecified origin and attempted to defuse the situation. Garcia ran to his vehicle, retrieved a handgun from the trunk, and shot "a couple of times" toward the truck. After the shots were fired, Herrera ran to the backyard.

¶ 64        Per Herrera, after the shooting, defendant had returned to the front yard and Garcia approached defendant "right by the front of the house on the sidewalk." Garcia attempted to give the firearm to defendant "to stash in the house." Defendant pushed the firearm away from himself and told him to leave with the firearm. Garcia ran to his car and drove away. Police officers arrived within ten minutes and arrested "everybody who was in the house," including both defendant and Herrera. Herrera was placed in a lineup and later in an interview room. He spoke with a detective in the interview room, but, when asked, could not remember the race of that detective. The detective told him that someone had identified him

as the shooter. Herrera testified that he told the detective that someone else had done the shooting. He gave the detective a description, but no name for the shooter. He denied that defendant was the shooter. The detective told him that if he did not cooperate by stating that defendant was the shooter, he would "go down as the accessory to murder."

¶ 65        Herrera also testified that police spoke to him again later that day when he was being released. At that point, he signed a statement implicating defendant because he did not want to be charged. Herrera was subsequently subpoenaed to testify at defendant's trial. Prior to trial, Herrera met with an attorney from the Cook County State's Attorney's Office in a courtroom. He told that attorney that defendant was not the shooter. The attorney told him that if he did not testify in accordance with his written statement, he would be "charged with perjury and something else." After hearing this, Herrera left the courtroom and did not return. Herrera stated that he was eventually arrested later in 2004 and sentenced to two years in prison for "perjury and contempt of court." Years later, Herrera was contacted by a private investigator who questioned him about the events of the shooting, prepared an affidavit, and had Herrera read and sign it.[3]

¶ 66        On cross-examination, Herrera testified that he grew up with defendant and went to elementary school with him. He stated that the people in the truck did not immediately get out, but "represented gang slogans" and then about four of the people in the truck got out. When asked if he told the police that two people got out and started swinging at him, he stated that he did not remember. When asked if he told the police that he did not actually see who fired the gun, he stated that he did not remember. He estimated that the encounter lasted 7-8 minutes. After the shooting, defendant came back to the front yard and Garcia attempted

---

[3]        Although Herrera did not specify when he was approached by the investigator, his affidavit was notarized on October 23, 2017.

to give defendant the gun. When asked when it was that he learned that the person who arrived at the house with Garcia that night was Garcia's cousin, Herrera stated that he had not ever learned that fact. Herrera confirmed that his affidavit stated that the person with Garcia was Garcia's cousin. The State also confirmed with Herrera that he had testified that four people had jumped out of the truck, while his affidavit stated that only two jumped out of the truck. Herrera confirmed that although his affidavit stated that "Garcia and the other guy made contact with one another but I could not see exactly what happened," he had testified that one of the men from the truck had snatched something from Garcia's neck. Herrera stated on cross and on redirect that the events took place a long time ago and he had difficulty remembering them. On re-cross examination, Herrera confirmed that the statement he did not remember giving and the statement that he was forced to sign were in fact the same statement.

¶ 67                                3. Carlos Figueroa

¶ 68        Carlos Figueroa, who was the boyfriend of defendant's half-sister, Nicole, at the time of the shooting, testified that he was at the Rodriguez house on the night of the shooting. At around midnight, Figueroa got in his truck, which was parked in the garage behind the house, and drove to Jewel-Osco. He was accompanied by two passengers: Nicole's sister, named Natalie Rodriguez, and Adam Rodriguez, who is Nicole and defendant's brother. Carlos estimated they were gone from the house for about 25 minutes. Upon returning and opening the garage, Carlos found that there was an unfamiliar car inside, which he later learned was Garcia's. Carlos' passengers, Natalie and Adam, left the truck to approach the car, at which point Garcia ran up to the side of the truck and told Natalie and Adam to get back in the truck. Garcia seemed "very excited and nervous." Adam refused and continued past Garcia,

but Natalie got back into the truck. Garcia got into the back seat of the truck and told Carlos "go, go, go."

¶ 69    Carlos testified that Garcia told him and Natalie that he had gotten into an altercation and that he believed he had shot and killed someone. Garcia showed the two of them a gun under his shirt and told Carlos to take him to his house. Carlos complied and drove Garcia 10 minutes away, to Garcia's home. Garcia told Carlos not to go anywhere and got out of the truck. Garcia went behind the fence behind his house before returning to the truck. Garcia told Carlos to return to the house and Carlos complied. Carlos "came around back to the alleyway" and stopped to let Natalie out before proceeding to the corner and letting Garcia out. Carlos drove the truck around and parked across the street in front of the house, where he found there to be a number of police cars and police officers present. Carlos "informed [a police officer] of the situation of what happened with Juan Garcia." Carlos was not allowed back in the home until defendant, Herrera, "another friend," and Nicole were handcuffed and taken away. Carlos testified that he spoke to defendant's attorney at defendant's home some day after the incident and during that interview, he gave the attorney the same information contained in his testimony. He stated that he was never called to testify.

¶ 70    On cross-examination, Carlos testified that when Garcia initially approached the truck, he had come from the back gate of the backyard. Carlos confirmed that the affidavit that he wrote himself in 2013 stated that after driving Garcia to his home, Carlos drove away. Carlos stated that he "did not put that part in." Carlos also confirmed that his written affidavit contained a number of additional details about what Garcia told him after entering his truck. The affidavit states that after getting into the truck, Garcia stated:

"[S]ome guys jump out a car and jump him and ripped off his chain and that they were fighting and then he went to the back of his vehicle trunk (which at that time was in front of [defendant's house]) pulled a [g]un from his trunk and started shooting at the people who had attacked him and that he believed that he had shot and killed somebody."

Garcia then threatened Carlos and Natalie after telling them that he had shot someone, stating: "just drive me to my house and no one gets hurt." Carlos attested in the affidavit that he drove away after dropping Garcia off at his house, then returned to defendant's house and parked in front of it.

¶ 71                                4. Natalie Rodriguez

¶ 72        Natalie testified in line with Carlos' testimony up to the point when Garcia was in the back seat of the truck. She stated that Garcia told them that "some guys jumped out of a vehicle and one of them took his chain so he got a gun and he shot at them." Natalie's additional testimony about the time Garcia was in the truck up to when she got out of the truck matched Carlos' testimony. Natalie entered the backyard and found police officers arresting her family members. An officer instructed Natalie to sit and be quiet. A man came into the backyard with police officers and was instructed to identify the shooter. When the man identified defendant, Natalie stood up and said "no, it wasn't him, it wasn't him." Natalie was again told to sit down and be quiet.

¶ 73        Natalie testified that she spoke with defendant's attorney and gave him the same information contained in her testimony. She was not called to testify at trial. She denied that defendant's attorney had ever told her he did not believe her but stated that it did feel like he did not believe her. Defendant asked Natalie some time around 2013 or 2014 to write an

22

affidavit and she did so. She stated that no one told her what to include and that she wrote the affidavit personally.

¶ 74    On cross-examination, Natalie stated that, at her parents' request, she never spoke with police about the events of that night. When shown exhibits depicting defendant and Garcia as they appeared at the time of the shooting, Natalie agreed that they looked nothing alike and indeed looked like exact opposites of one another. Natalie stated that when Garcia was in the truck, he never mentioned killing anyone. She confirmed that when she, Carlos, and Garcia left to go to Garcia's home, the garage door was open, but it was closed when they returned.

¶ 75    When questioned by the circuit court on her discussion with defendant's attorney, Natalie stated that defendant's attorney told her that he was not going to call her as a witness because she was related to the defendant and therefore the jury would not believe her.

¶ 76                            5. Adam Rodriguez

¶ 77    Adam Rodriguez testified consistently with Carlos and Natalie regarding the events leading up to encountering Garcia. Adam stated that Garcia was tucking something black with a handle under his shirt when he approached the truck. Adam entered the house and was there 5 to 10 minutes before police arrived. At some unspecified point in time, Adam told family members about what he had seen, and they told him not to worry, because they would hire a lawyer. Adam told defendant's lawyer what happened but was never called to testify. On redirect examination, Adam stated that the item he had seen Garcia holding was a gun. When further questioned by the circuit court and defendant, Adam stated that although he only saw the handle, it looked like a gun handle, and he deduced that the item he had seen was a gun.

¶ 78                              6. Mike Gillespie

¶ 79       Mike Gillespie, defendant's trial attorney, testified that he did in fact represent defendant, but had little to no specific recollection of the events of his representation. Gillespie testified that he did not remember if he told defendant that he could file a motion for substitution of judge, but it is his standard procedure to inform his clients of their rights. He stated that he did not have the file from defendant's trial. He stated that it was his assumption that he had thrown it out, as it is his practice to do so after keeping the file for the mandated period of years. He stated that he made no personal effort to interview any of the State's witnesses, but he would have had an investigator attempt to talk to them. Gillespie stated that it appeared based on his answer to discovery that he identified four witnesses that he might have called in support of defendant's defense, including Natalie Rodriguez and Adam Rodriguez. Gillespie had no specific recollection but assumed that if their names were on the list, he would have spoken to them. He did not recall which witnesses he called or did not call but agreed that the record provided an accurate representation of who was called. He did not recall why he did not call Carlos, Natalie, or Adam, but assumed that if he did not call them, it was because their testimony did not support his theory of defense. Gillespie testified that if anyone had said they saw someone else do the shooting, he would have called that witness. He stated that he would have put names on the list based on somebody telling him they knew something about the case.

¶ 80                          7. Defendant Juan Rodriguez

¶ 81       Defendant testified that Gillespie spoke to him about the possibility of calling Natalie, Adam, and Carlos at trial and that he expected Gillespie to call them.

¶ 82                            8. Postconviction Court Order

¶ 83        On February 18, 2020, the circuit court entered an order denying defendant's post-conviction petition. Regarding defendant's actual innocence claim, the circuit court found that Herrera's testimony was not new, was cumulative, was not sufficiently conclusive, was impeachable, and was not credible. The circuit court found that Dr. Strange's testimony was not sufficiently conclusive and, further, went to the issue of reasonable doubt rather than presenting evidence of actual innocence. The circuit court found defendant's *Brady* claim based on Herrera's testimony to be immaterial and to not represent a reasonable probability that the withheld evidence would have changed the outcome of the case.

¶ 84        The circuit court found that defendant failed to establish that defendant's trial counsel's representation fell below an objective standard of reasonableness or prejudiced defendant. The circuit court found that defendant's claim that his appellate counsel was ineffective for failing to appeal the trial court's denial of his pre-trial motion to suppress also failed to meet defendant's burden. Lastly, the circuit court declined to consider defendant's *Miller* claim, stating that the claim was filed in a supplement to the post-conviction petition for which defendant never sought leave and that had not been answered or fully heard before the court. In the same order, the circuit court denied defendant leave to supplement or amend the petition with additional claims.

¶ 85        On April 9, 2020, defendant filed a motion for reconsideration regarding the denial of his *Miller* claim. The State agreed to a new sentencing hearing and the circuit court granted the motion for reconsideration on August 6, 2020. A resentencing hearing was held June 8, 2021. On July 14, 2021, the resentencing court sentenced defendant to 21 years' imprisonment for first-degree murder, 6 years' imprisonment for aggravated battery with a firearm, and 5

years' imprisonment for aggravated discharge of a firearm, all to run consecutively for a total of 32 years' imprisonment.

¶ 86       On July 16, 2021, defendant timely appealed, and this appeal follows.

¶ 87       II. ANALYSIS

¶ 88       Under section 122-1 of the Post-Conviction Hearing Act (the Act), an individual serving a term of imprisonment may institute a proceeding pursuant to the Act asserting that "in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." 725 ILCS 5/122-1 (West 2012). Postconviction petitions are subject to three stages of review before the circuit court. *People v. Domagala*, 2013 IL 113688, ¶ 32. "First, the circuit court may dismiss postconviction petitions that are frivolous or patently without merit." (Internal quotation marks omitted.) *Id*. "If the circuit court does not dismiss the petition, it advances to the second stage. At the second stage, counsel may be appointed to an indigent defendant and the State may file a motion to dismiss or an answer to the petition." *Id*. ¶ 33. "At this stage, the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." (Internal quotation marks omitted.) *Id*. "If the petitioner makes the requisite substantial showing that his constitutional rights were violated, he is entitled to a third stage evidentiary hearing." *Id*. ¶ 34. "At such a hearing, the circuit court serves as the fact finder and, therefore, it is the court's function to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts." *Id*. "At this stage, the circuit court must determine whether the evidence introduced demonstrates that the petitioner is, in fact, entitled to relief." *Id*.

¶ 89    Defendant asserts that the circuit court erred in several ways in its final order denying relief following a third-stage evidentiary hearing. Defendant states that the circuit court erred: (1) when it declined to grant defendant a new trial based on his actual innocence claims, particularly with regard to the testimony of Herrera and Dr. Strange; (2) when it denied defendant relief based on his *Brady* claim regarding Herrera's testimony; (3) when it found that defendant failed to establish that trial counsel's representation fell below an objective standard of reasonableness; and (4) when it found that defendant failed to carry his burden to establish that appellate counsel was ineffective. Defendant also argues that the resentencing court erred when it ordered that defendant's terms of imprisonment all run consecutively to one another.

¶ 90                                    A. Standard of Review

¶ 91    "When a petition is advanced to a third-stage evidentiary hearing, where fact-finding and credibility determinations are involved, we will not reverse a circuit court's decision unless it is manifestly erroneous." *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). A decision is manifestly erroneous "if the court committed an error that is clearly evident, plain, and indisputable." (Internal quotation marks omitted.) *People v. Eubanks*, 2021 IL 126271, ¶ 47. If no fact-finding or credibility determinations are necessary at the third stage, "*i.e.*, no new evidence is presented and the issues are pure questions of law, we will apply a *de novo* standard of review, unless the presiding judge has some 'special expertise or familiarity' with the trial or sentencing of the defendant and that 'familiarity' has some bearing on disposition of the postconviction petition." *Pendleton*, 223 Ill. 2d at 473 (citing *People v. Caballero*, 206 Ill. 2d 65, 87-88 (2002)). "A de novo review entails performing the same analysis a trial court would perform." *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 92                                B. Actual Innocence

¶ 93         "[I]n order to succeed on a claim of actual innocence, the defendant must present new, material, noncumulative evidence that is so conclusive that it would probably change the result on retrial." *People v. Coleman*, 2013 IL 113307, ¶ 96 (citing *People v. Washington*, 171 Ill. 2d 475, 489 (1996)). "New means the evidence was discovered after trial and could not have been discovered earlier through exercise of due diligence." *Id.* "Material means the evidence is relevant and probative of the petitioner's innocence." *Id.* "Noncumulative means the evidence adds to what the jury heard." *Id.* "And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result." *Id.* "[T]he sufficiency of the State's evidence to convict beyond a reasonable doubt is not the determination that the trial court must make." *Id.* ¶ 97. "Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Id.*

¶ 94                         1. Freestanding Nature of the Claim

¶ 95         The State argues that defendant's actual innocence claim must be rejected because the Herrera affidavit is used both to support defendant's actual innocence claim and his *Brady* claim, and thus the claim is not freestanding. The State grounds this argument on *People v. Hobley*, in which our supreme court interpreted its own holding in *Washington* to establish that "[a] 'free standing' claim of actual innocence is 'one in which the newly discovered evidence is not being used to supplement an assertion of a constitutional violation with respect to the defendant's trial.' " *People v. Hobley*, 182 Ill. 2d 404, 443-44 (1998) (citing *Washington*, 171 Ill. 2d at 490). This so-called "*Hobley* rule" has been echoed explicitly only once by our supreme court, in *People v. Orange*, 195 Ill. 2d 437, 459-60 (2001). The State

also cites the more recent case of *People v. Taliani*, 2021 IL 125891, but that case reflects the original text of *Washington* and makes no holding with regard to the meaning of "freestanding," nor does it mention *Hobley*.

¶ 96    Defendant argues that the State misapprehends the holdings of *Hobley* and *Orange* and, in fact, those cases were never intended to be read to forbid the alternative pleading of different constitutional violations based in separate legal theories, but the same evidence. Defendant correctly points out that it is clear in the original text of *Washington* that the language relied on in *Hobley* and *Orange* was present not to create a mandate, but to distinguish the freestanding claim that was cognizable under the Illinois constitution, but not under the federal constitution, from a gateway claim, which was the only form in which an actual innocence claim was cognizable under the federal constitution. *Washington*, 171 Ill. at 479-489.

¶ 97    The defendant in *Hobley* was convicted of multiple counts of felony murder and arson. *Hobley*, 182 Ill. 2d at 404. The defendant articulated an actual innocence claim based on a fingerprint test conducted on a gas can found at the scene that had produced a negative result, as well as upon the fact that a second gas can was found at the scene. *Id.* at 443. The defendant's postconviction petition also asserted a constitutional violation under *Brady* based on the State's suppression of the fingerprint report, the State's suppression of the fact that a second gas can was found, and the State's destruction of the second gas can. *Id.* at 428-29. The *Hobley* defendant's *Brady* claims were based on "two subpoenas; the affidavit of one of defendant's post-conviction attorneys; the affidavit of a defense investigator; a lab report related to defendant's case * * *; and several other police reports * * * including a fingerprint

29

report and report referencing a one-gallon can." *Id*. at 429. The *Hobley* court did not specify which pieces of evidence the actual innocence claim was based on, but opined:

"In this appeal, we have already held that the State's actions regarding the fingerprint report and second gasoline can may establish a violation of defendant's constitutional right to due process under *Brady*. Consequently, this evidence does not support a 'free-standing' claim of actual innocence. Rather, the newly discovered evidence defendant points to here *is* being used to supplement his assertions of constitutional violations with respect to his trial. Defendant has therefore not properly raised a claim of actual innocence under *Washington*.

In addition, defendant briefly mentions that he has newly discovered evidence showing that the officers at Area 2 engaged in a pattern and practice of police torture. This evidence, however, is being used to supplement defendant's assertion * * * that his confessions were coerced and involuntary and that the introduction of these confessions violated his constitutional rights. Therefore, this evidence also fails to support a 'free-standing' claim of actual innocence under *Washington*.

In conclusion, defendant is not entitled to either an evidentiary hearing or a new trial on his actual innocence claim." (emphasis in original) *Id*. at 444.

¶ 98    Our court's opinion in *Martinez* provides an insightful analysis on the subject of the *Hobley* rule. *People v. Martinez*, 2021 IL App (1st) 190490. The most common interpretation of *Hobley* to date, as described in *Martinez*, has been that "[w]hereas *Washington* held that a defendant was not *required* to rely on an underlying constitutional claim to assert actual innocence, *Hobley* found that the defendant was not *allowed* to rely on the same evidence to pursue both a constitutional claim of trial error and a freestanding actual innocence claim."

*Martinez*, 2021 IL App (1st) 190490, ¶ 99. This interpretation narrows the door opened by *Washington* by requiring largely *pro se* petitioners to assiduously separate evidence used to support an actual innocence claim from all evidence offered to support other constitutional claims in the same postconviction petition. To impose such a requirement does not effectively weed out claims lacking a valid claim of actual innocence, but only serves to block any actual innocence claim not pled in accordance with this arbitrary requirement. Further, such an additional limitation is unnecessary in light of the extremely high bar for actual innocence claims established in *Washington*, 171 Ill. 2d at 489.

¶ 99        *Martinez* went on to assert:

> "It would seem that the decision in *Hobley* attempted to track *Washington*'s application of the law, but in doing so, deviated from both the spirit and letter of the law as set forth in *Washington*. *Hobley* identified no principle or purpose that would be furthered by prohibiting a defendant from using the same evidence to assert both a constitutional claim of trial error and an actual innocence claim. Furthermore, the *Hobley* rule would potentially force a defendant to choose to forgo a meritorious claim of trial error in order to pursue an actual innocence claim." *Martinez,* 2021 IL App (1st) 190490, ¶ 102.

¶ 100        We agree with *Martinez* that *Hobley*, thusly interpreted, would represent an unprincipled modification of the law established in *Washington*. *Martinez* found *Hobley* to be inapplicable, as its holding was inconsistent with our supreme court's more recent opinion in *People v. Coleman*:

> "*Coleman* * * * stated that 'a freestanding actual-innocence claim is independent of any claims of constitutional error at trial and focuses solely on a defendant's factual

31

innocence in light of new evidence.' Thus, *Coleman*'s explanation of a freestanding actual innocence claim contemplates that the *claims* be independent, not that the actual innocence claim be independent of the *evidence* underlying his other constitutional claim of trial error." *Martinez*, 2021 IL App (1st) 190490, ¶ 104 (citing *Coleman*, 2013 IL 113307, ¶ 83).

¶ 101    In *Martinez*, our court went on to assert that, per *Coleman*, "a court should grant relief if the defendant has presented evidence that is (1) new, (2) material, (3) noncumulative, and (4) so conclusive that it would probably change the result on retrial." *Id.* ¶ 105 (citing *Coleman*, 2013 IL 113307, ¶ 84). This court reasoned that *Hobley* effectively added a fifth requirement and since that fifth requirement was not present in *Coleman*'s articulation of the requirements of an actual innocence claim, *Hobley* was not reconcilable with *Coleman*. *Id.* ¶ 105-06. *Coleman* does not make note of *Hobley*'s fifth requirement, and asserts that "[i]n the 17 years since we decided *Washington*, nothing has changed," *Coleman*, 2013 IL 113307, ¶ 93, and that "[o]ur commitment to [*Washington*'s] holding is unwavering." *Id.* We conclude that *Hobley*'s fifth requirement is no longer part of our supreme court's definition of a freestanding actual innocence claim.

¶ 102    Since the text of *Coleman* asserts that a freestanding claim is one in which the *claim* is separate from any other claim of a constitutional violation, we will review the facts of this case through that lens. Here, defendant alleges a *Brady* violation with regard to the State's withholding of evidence regarding a statement from Herrera, but Herrera's affidavit also includes testimony regarding the events surrounding the offense and that testimony supports a freestanding claim of actual innocence unrelated to any state action. There is no assertion of

a constitutional violation related to Dr. Strange or the evidence she presented. Accordingly, defendant's actual innocence claim is freestanding.

¶ 103                                     2. Testimony of Saul Herrera

¶ 104        Defendant argues that it was manifest error for the circuit court to deny defendant a new trial where Herrera's testimony was new, noncumulative, and sufficiently conclusive. Defendant's argument on this subject contains a number of complaints about the circuit court judge, as well as conclusions about that judge's intentions. It is clear from the record that defense counsel found the judge's demeanor less than ideal. However, this court's role is to review circuit court decisions for error, not to settle tensions between attorneys and the court. Defendant does not argue that the circuit court judge's demeanor amounted to error of any kind, and such extraneous commentary is irrelevant to our appellate review. Instead, we will address the issue before us: whether it was manifest error for the circuit court to deny defendant a new trial based on Herrera's testimony. We will not examine the question of whether Herrera's testimony was material as the circuit court made no finding on that point and it is unnecessary to our analysis.

¶ 105                                         a. New Evidence

¶ 106        To qualify as new evidence suitable for a postconviction actual innocence claim, it must be evidence that was "discovered after trial and could not have been discovered earlier through the exercise of due diligence." *Coleman*, 2013 IL 113307, ¶ 96. The State argues that because defendant knew that Herrera was present when the shooting took place, Herrera's testimony about the events of the shooting is not newly discovered evidence. Even if it is newly discovered, the State argues, defendant could have discovered it prior to trial through due diligence and has not demonstrated that he performed such due diligence.

33

¶ 107    Our supreme court's guidance in *People v. Edwards*, 2012 IL 111711, is instructive on this point. In that case, the petitioner presented alibi affidavits as newly discovered evidence of his innocence. *Id.* ¶ 12. The *Edwards* court stated that "[p]etitioner does not dispute that he knew of the alibi at the time of the trial. Petitioner's argument is that this evidence was unavailable to him." *Id.* ¶ 35. The petitioner there asserted that the evidence was unavailable because the alibi witnesses refused to testify, a claim that was supported only by assertions to that end from the witnesses in their affidavits. *Id.* Our supreme court held that since no evidence was presented that there was an attempt to subpoena the two alibi witnesses, the evidence could have been discovered sooner through the exercise of due diligence and therefore was not newly discovered. *Id.* ¶ 37. However, the *Edwards* court opined: "We do not conclude that such evidence could never be considered unavailable where, as here, the witnesses rejected the petitioner's attempts to persuade them to testify." *Id.*

¶ 108    While, in the case at bar, there is no evidence that an effort was made to persuade Herrera to testify on defendant's behalf at the time of trial, we believe that this case falls into a very narrow category wherein the evidence is newly discovered despite a lack of showing from defendant that he did his due diligence. The reason for this conclusion is that the specific facts of this case present a scenario in which there was no action defendant could have taken at the time of the trial to constitute due diligence. In *Edwards*, there was nothing put into the record to confirm that the potential witnesses had refused to testify. In this case, Herrera had signed a statement implicating defendant, he was listed as a prosecution witness, and defendant even moved to exclude his testimony. As far as defendant was aware, Herrera intended to testify against him. To subpoena him to testify on defendant's behalf would have

34

been nonsensical without the information provided in Herrera's affidavit and postconviction testimony, neither of which were available to defendant's attorney at trial.

¶ 109    The State argues that defendant should have been on notice that Herrera was not cooperating with the State because he had failed to answer the State's subpoena and a warrant had been issued for his arrest. Defendant argues that if the State could not produce Herrera to testify, defendant could not be expected to have better luck producing him. Even if we were to accept, *arguendo*, that efforts constituting due diligence could have resulted in contact with Herrera, we do not believe that those efforts constituting due diligence include divining that a prosecution witness' non-cooperation indicates availability and interest in testifying on defendant's behalf. Accordingly, we find that the circuit court erred in finding that the evidence was not new.

¶ 110                                    b. Noncumulative Evidence

¶ 111    Defendant argues that the circuit court erred by finding that Herrera's testimony was cumulative. "Noncumulative means the evidence adds to what the jury heard." *Coleman*, 2013 IL 113307, ¶ 96. While an actual innocence claim as a whole must overcome a heavy burden to warrant a new trial, the bar for evidence to qualify as non-cumulative is quite low. The State argues that the circuit court was right when it expressed doubt that a witness whose testimony largely echoes that of Gutierrez, Martin, and defendant would sway a jury, but that is an argument as to the conclusiveness of the testimony, not whether or not it is cumulative.

¶ 112    Defendant offers three facts that Herrera testified to that he argues are not cumulative to other testimony offered at trial. Most notably, Herrera stated that one of the men in the truck shouted "get the dude with the teardrop tattoo" before defendant ran toward the gangway. Regardless of what value a trier of fact might assign to this piece of testimony, we cannot say

it is cumulative with any of the other testimony. Accordingly, we disagree with the circuit court and at least a portion of Herrera's testimony was noncumulative.

¶ 113                                    c. Conclusive Evidence

¶ 114        "[C]onclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result." *Id.* ¶ 96. Our task is not to reweigh the circuit court's credibility determinations, it is to determine whether the circuit court's decision was manifestly erroneous. Is it "clearly evident, plain, and indisputable" that the circuit court's decision was erroneous? *People v. Eubanks*, 2021 IL 126271, ¶ 47. The circuit court found that Herrera's testimony was not sufficiently conclusive because (1) defendant, Gutierrez, and Martin testified to "essentially the same thing," (2) Herrera's testimony about the attempted hand-off of the gun was contradictory to defendant's testimony because the handoff occurred in a different place, (3) Herrera's testimony was impeachable with his signed statement implicating defendant, (4) the court found Herrera's testimony regarding police coercion to not be credible.

¶ 115        The circuit court's assertion that Herrera's testimony was largely in line with that of defendant, Gutierrez, and Martin is an accurate reflection of the record, though it was not identical. Although defendant insists otherwise, the record reflects that defendant testified that Garcia tried to hand off the gun to him twice: once in the back yard and once in the house. Gutierrez testified that Garcia attempted to hand off the gun to defendant but did not specify where that interaction took place. Herrera's testimony that the attempted handoff occurred "right by the front of the house on the sidewalk" is inconsistent with the other witnesses' testimony at trial. The circuit court was not wrong in its assertion that Herrera could be impeached with his signed statement, even if he would testify that that statement

36

was coerced. Though the circuit court did not mention it in its decision, there were also significant differences between the version of events described in Herrera's affidavit and Herrera's postconviction testimony, such as how many people got out of the truck. Such discrepancies could also be used to further impeach Herrera. Lastly, the circuit court's credibility finding regarding Herrera's testimony about police coercion was not manifestly erroneous.

¶ 116    The proposed value of Herrera's testimony is that (1) he is an additional eyewitness testifying that Garcia was in fact the shooter, (2) his testimony that someone in the truck yelled "get the guy with the teardrop" shows why defendant ran toward the gangway and militates against the idea that he went to fetch a firearm, (3) his testimony regarding the attempted handoff of the weapon would explain why defendant tested positive for gunshot residue, and (4) he could also testify to police officers' efforts to coerce him into implicating defendant.

¶ 117    The bar for granting a new trial based on a claim of actual innocence is a high one—the question, again, is not whether there is any value to the evidence provided in the postconviction petition, but whether it was clearly evident, plain, and *indisputable* that the circuit court's decision was erroneous. *People v. Tyler*, 2015 IL App (1st) 123470, ¶152. Comparing the potential value of the testimony Herrera could offer if a new trial were granted against the trial court's findings and the testimony provided at the third-stage evidentiary hearing, we cannot say that the circuit court's holding that Herrera's testimony was insufficiently conclusive was manifestly erroneous.

¶ 118                    3. Testimony of Dr. Deryn Strange

¶ 119        Dr. Strange submitted a report and testified to the unreliability of eyewitness identification testimony and her impression, based on a reading of the record, of the likelihood that the factors that tend to make identifications unreliable affected the identifications in this case. Our supreme court has held on multiple occasions that impeachment evidence is insufficient to justify the grant of a new trial. *People v. Prante*, 2023 IL 127241, ¶ 80; *People v. Ortiz*, 235 Ill. 2d 319, 335 (2009); *People v. Smith*, 177 Ill. 2d 53, 82 (1997). Dr. Strange's testimony is valuable solely for the purpose of impeachment. Accordingly, without needing to address the question of whether Dr. Strange's testimony is new, noncumulative, and conclusive, we find that Dr. Strange's testimony was insufficient to warrant a new trial.

¶ 120        Accordingly, we affirm the circuit court's denial of defendant's actual innocence claim.

¶ 121                              C. *Brady* Claim

¶ 122        Defendant argues that his due process rights under *Brady* were violated because the State did not disclose to the defense that Herrera told the police that defendant was not the shooter and later, upon responding to a subpoena to testify in defendant's case, told an assistant state's attorney (ASA) that defendant was not the shooter.

¶ 123        Defendant fails to articulate anything more about the violated right and makes no citation whatsoever to the record or case law to support this argument, failing even to properly cite *Brady* itself. In its response, the State raises defendant's failure to support his *Brady* claim with legal citation. Defendant states in his reply brief that he "saw no reason to cite factually distinguishable cases that will not aid this Court's analysis or cite cases that merely regurgitate the relevant *Brady* standard which is not in dispute." An assumption, no matter

how safe it may be, that this court already understands the basis for one's argument does not justify a disregard for the court's rules governing the requirements for appellate briefs. However, we will consider defendant's argument despite these flaws.

¶ 124    In *Brady*, "the Supreme Court held that the prosecution violates an accused's constitutional right to due process of law by failing to disclose evidence favorable to the accused and material to guilt or punishment." *People v. Beaman*, 229 Ill. 2d 56, 73 (2008). For the purposes of *Brady* violations, undisclosed information known to police, but not the prosecutor still constitutes a violation. *Id*. To establish a *Brady* violation, a defendant must show that "(1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either willfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." *Id.* at 73-74.

¶ 125    We first address the question of whether the evidence was suppressed by the State. Our case law is of little help in discerning what quantum of proof is necessary to satisfy the required showing that evidence was suppressed, as the question is usually either undisputed or elided in favor of the other requirements laid out in *Brady*. Here, however, no evidence whatsoever is presented on the subject. In his post-conviction petition, defendant alleges that the State "failed to disclose exculpatory evidence that Saul Herrera first told the police and later disclosed to prosecutors directly that [defendant] was not the shooter." The State responded to the petition with a blanket denial. Accordingly, even if the trial court had found Herrera to be credible and accepted that Herrera had in fact made the alleged statements to police and prosecutors, not one iota of evidence was adduced showing that the evidence was suppressed. We are left only with a bare allegation.

¶ 126    In his post-conviction petition, defendant focused wholly on establishing, via Herrera's affidavit, that the evidence existed, and then arguing that the evidence was favorable and material. Defendant cited no evidence establishing nondisclosure or suppression in either his petition or this appeal, and Herrera's affidavit asserts only what he told police and prosecutors, not whether that information made its way to defendant. At defendant's third-stage evidentiary hearing, defendant and his trial attorney were both called to testify, but in neither case were they asked whether they were made aware of Herrera's statements to police and prosecutors. Defendant testified that he never saw the discovery in this case prior to post-conviction proceedings and that he barely had the opportunity to speak with his trial attorney, so we cannot say the record demonstrates that defendant had a sufficiently comprehensive awareness of what evidence was available to the defense to testify to non-receipt of this evidence, even if he had been asked. In closing arguments, defense counsel asserted that "[c]ertainly even Mr. Gillespie probably would have used that evidence if he had known." This is an assumption. It is not evidence.

¶ 127    While the circuit court's decision did not make note of the lack of evidence on this point, our concern as a reviewing court is the lower court's result, not its rationale. *People v. Johnson*, 208 Ill. 2d 118, 128 (2003). Without reaching the questions of favorability and materiality, where no shred of evidence is presented to establish suppression of evidence, we cannot say the circuit court's denial of defendant's *Brady* claim was against the manifest weight of the evidence.

¶ 128    Furthermore, the only evidence suggesting the existence of the allegedly-withheld information consists of Herrera's affidavit and his testimony at the third-stage evidentiary hearing. The circuit court stated twice in its order that it did not find Herrera's testimony to

be credible. Defendant notes that the circuit court did not indicate specific portions of Herrera's testimony that were not credible, nor did it explain the basis of its credibility finding, but defendant cites no caselaw to establish that the circuit court is obligated to do so. We defer to the circuit court's determinations of credibility as the fact-finder in a third-stage evidentiary hearing except where those determinations are manifestly erroneous. *People v. Fair*, 2024 IL 128373, ¶ 97.

¶ 129    It is arguable that Herrera's willingness to flee rather than testify lends credibility to his story, but that requires inferring that his actions were predicated on an insistence on recanting coerced testimony and instead testifying to the truth rather than the equally valid inferences that his refusal to appear in response to the State's subpoena was out of fear of retaliation from the gang to which defendant belonged or that the action was out of loyalty to a friend he had known since elementary school. Whatever unspecified inferences the circuit court may have drawn, it is true that Herrera's signed statement to police in the wake of the offense contradicts his affidavit and post-conviction testimony, and it is true that Herrera's post-conviction testimony contradicted his affidavit with regard to some of the specific facts of what happened on the night of the shooting. When confronted with a contradiction between his affidavit and his testimony regarding his knowledge or lack thereof as to whether Garcia and defendant were cousins, he responded: "I mean, you're asking me if I read this. I didn't read this. Now you're asking me if that's what I said. If that's what I said, that's what I wrote, that's what I said." When confronted with a contradiction between his affidavit and his testimony regarding the number of people who jumped out of the back of the truck prior to the shooting, the following exchange occurred:

      STATE: So that is, in fact, also inaccurate, right?

HERRERA: Two people jumped out. It's like you're asking me something I might not recall, I don't remember it. It's been a long time. You have to understand that.

STATE: It could have been two people, it could have been four people; you don't recall, right?

HERRERA: Correct.

¶ 130     The question before us is not how we would have weighed Herrera's credibility, but whether the circuit court's credibility determination was manifestly erroneous. Considering all of the above, we cannot say it was, so we affirm the circuit court's denial of defendant's *Brady* claim.

¶ 131                         D. Ineffective Assistance of Trial Counsel

¶ 132     Defendant asserts that his Sixth Amendment right to effective assistance of counsel was violated by his trial counsel's failure to present the testimony of Natalie, Adam, and Carlos. We find no error in the circuit court's factual finding that defendant's trial counsel, Gillespie, spoke to Natalie, Adam, and Carlos, but did not call them at trial. All three testified to those facts during the third-stage evidentiary hearing. Accordingly, the question before us under a *de novo* standard of review is whether Gillespie's decisions rose to the level of ineffective assistance of counsel. *People v. Hale*, 2013 IL 113140, ¶ 43 ("In general, the standard of review for determining if an individual's constitutional rights have been violated is *de novo*."). To determine whether a defendant was denied his or her right to effective assistance of counsel, we must apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (citing *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland*)). Under *Strickland*, a defendant must prove both (1) his attorney's actions constituted errors so serious as to fall below an objective standard of

reasonableness and (2) absent these errors, there was a reasonable probability that his trial would have resulted in a different outcome. *People v. Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 687, 694). To prevail, the defendant must satisfy both prongs of the *Strickland* test. *Colon*, 225 Ill. 2d at 135.

¶ 133     Under the first prong of the *Strickland* test, the defendant must prove that his counsel's performance fell below an objective standard of reasonableness "under prevailing professional norms." *Colon*, 225 Ill. 2d at 135; *People v. Evans*, 209 Ill. 2d 194, 220 (2004). In considering whether counsel's performance was deficient, a court must indulge a strong presumption that the challenged action or inaction was the result of sound trial strategy. *People v. Smith*, 195 Ill. 2d 179, 188 (2000); *People v. Evans*, 186 Ill. 2d 83, 93 (1999).

¶ 134     Under the second prong, the defendant must show that, "but for" counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Colon*, 225 Ill. 2d at 135; *Evans*, 209 Ill. 2d at 220. "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *Evans*, 209 Ill. 2d at 220; *Colon*, 225 Ill. 2d at 135. In other words, the defendant was prejudiced by his attorney's performance. *People v. Lacy*, 407 Ill. App. 3d 442, 457 (2011).

¶ 135     Defendant asserts that the testimony offered by Natalie, Adam, and Carlos was highly compelling and that "failure of trial counsel to call a witness who would contradict the State's evidence and support the defense reflects deficient performance." Defendant cites to four cases for this proposition: *People v. Ramirez-Lucas*, 2017 IL App (2d) 150156, ¶ 44; *People v. Makiel*, 358 Ill. App. 3d 102, 108 (2005), *People v. Butcher*, 240 Ill. App. 3d 507,

510 (1992), *People v. Skinner*, 220 Ill. App. 3d 479, 485 (1991). All four cited cases concern otherwise-uncorroborated theories of defense and therefore are not comparable to the case at bar. Here, Gutierrez and Martin corroborated defendant's testimony that he was innocent and that Garcia was the shooter. While defendant is correct in his assertion that the circuit court made no explicit finding that trial counsel's decisions were sound trial strategy, defendant also makes no demonstration that such an explicit finding is necessary. There were inconsistencies between the versions of events presented by Natalie, Adam, and Carlos. Presentation of their testimony could have led to contradictions with the testimony presented by Martin and Gutierrez, both of whom testified that after Garcia left, they were speaking in the backyard, yet neither of whom made any mention of a vehicle entering the garage during that time. Even if we assume that a jury would find it believable that Garcia's course of action after shooting someone was to leave his car in the garage at the scene of the crime, it is doubtful that he could have done so without Gutierrez and Martin noticing.

¶ 136    Further, none of the three proposed witnesses saw the shooting. Carlos saw Garcia with a gun near the scene of the crime and testified that Garcia told him that he had shot at someone and thought that he had killed him. Natalie was present with Garcia at all times that Carlos was, but denied that Garcia ever showed them a gun or stated that he killed anyone. Adam saw Garcia near the scene of the crime with what he believed to be a gun. It would not have been unreasonable for an attorney in Gillespie's position to decide that corroborating defendant's theory of defense with Martin and Gutierrez, who saw the events themselves, would present a cleaner and more coherent story for the jury without the risk of perceived contradictions from the additional testimony of Natalie, Carlos, and Adam. Defendant has not overcome the presumption that defendant's trial counsel's decision not to call Natalie,

Carlos, and Adam was sound trial strategy. Accordingly, we affirm the trial court's decision with regard to the issue of ineffective assistance of trial counsel.

¶ 137                    E. Ineffective Assistance of Appellate Counsel

¶ 138    Defendant argues that his counsel on direct appeal was ineffective for failing to assert that the trial court erroneously denied defendant's motion to suppress Torres' identification of defendant in the lineup. "Claims of ineffective assistance of appellate counsel are measured against the same standard as those dealing with ineffective assistance of trial counsel." *People v. Childress*, 191 Ill. 2d 168, 175 (2000). "Appellate counsel can only be ineffective for failing to raise issues that were apparent on the face of the record." *People v. Dixon*, 2019 IL App (1st) 160443, ¶ 43. However, appellate counsel "is not obliged to raise every conceivable issue on appeal and it is not incompetence to refrain from raising issues which, in counsel's judgment, are without merit, unless counsel's appraisal of the merits is patently wrong." *People v. Jones*, 399 Ill. App. 3d 341, 372 (2010).

¶ 139    As no new evidence was presented on this issue and the question is purely a question of law, our review is *de novo*. *Pendleton*, 223 Ill. 2d at 473. "A trial court's factual determination that an identification procedure was not unduly suggestive should not be reversed unless it is against the manifest weight of the evidence, *i.e.* an opposite conclusion is apparent or the findings appear to be unreasonable, arbitrary, or not based on evidence." *People v. Ortiz*, 2017 IL App (1st) 142559, ¶ 21. "However, the ultimate determination of whether the trial court's suppression ruling was proper given the factual circumstances at issue is a legal question, which we review *de novo*." *Id.*

¶ 140    "When challenging a lineup identification, the defendant bears the initial burden to show it was impermissibly suggestive." *People v. Smith*, 2023 IL App (1st) 181070, ¶ 36 (citing

*People v. Clifton*, 2019 IL App (1st) 151967, ¶ 60). "If the defendant makes such a showing, the burden shifts to the State to show by 'clear and convincing evidence that the witness is identifying the defendant based on his or her independent recollection of the incident.' " *Id.* ¶ 36 (citing *People v. Brooks*, 187 Ill. 2d 91, 126 (1999)).

¶ 141      Notwithstanding whether or not the lineup in question was impermissibly suggestive, appellate counsel was not ineffective for failing to raise the denial of the motion to suppress on appeal. The trial court held that the lineup was not impermissibly suggestive without the burden of proof ever shifting to the State to prove that Torres' identification had an independent basis. However, the trial court judge heard testimony at the pretrial hearing that established that Torres described the shooter as a male Hispanic with long hair and a teardrop tattoo, within minutes of the shooting. Upon returning to the scene of the crime with police, Torres observed multiple individuals in the back yard and did not identify any of them as the shooter, but, upon seeing defendant, pointed him out as the shooter. The trial court did not base its denial on these facts, as the question before it was whether the lineup was suggestive. The trial court did, however, deny a motion to quash the arrest based on that testimony, indicating that the trial court found the testimony to be credible.

¶ 142      There is no testimony in the record that contradicts the fact that Torres identified defendant at defendant's house within minutes of the shooting. Defendant's appellate counsel may have judged that it was likely that, even if defendant were to prevail on the matter of the suggestiveness of the lineup identification, the only relief would have been a remand for a hearing to give the State the opportunity to present the same evidence a second time to show an independent basis for Torres' identification. It would have been reasonable for defendant's appellate counsel to conclude that the State would almost certainly prevail upon

46

remand, so it would not have been an unreasonable strategic decision to forgo the issue and focus on those more likely to lead to meaningful relief for defendant. Accordingly, we cannot find that appellate counsel's representation fell below an objective standard of reasonableness and so defendant's claim fails. As defendant has failed to satisfy the first prong of *Strickland* and both prongs must be satisfied for an ineffective assistance of counsel claim to succeed, we need not consider the second prong. *Colon*, 225 Ill. 2d at 135.

¶ 143                                    F. Sentencing

¶ 144        The resentencing court sentenced defendant to 21 years' imprisonment for first-degree murder, 6 years' imprisonment for aggravated battery with a firearm, and 5 years' imprisonment for aggravated discharge of a firearm, with all three terms to run consecutively. Both parties agree that this sentence was erroneous. One of the circumstances in which consecutive sentencing is mandatory is when "[o]ne of the offenses for which the defendant was convicted was first degree murder or a Class X or Class 1 felony and the defendant inflicted severe bodily injury." 730 ILCS 5/5-8-4(d)(1) (West 2020). Our supreme court has since held that this provision applies only where the defendant inflicted severe bodily injury during the commission of the triggering felony. *People v. Whitney*, 188 Ill. 2d 91, 98-99 (1999). Both parties agree that in the case at bar, each of the three charges have separate victims and neither the original sentencing court nor the resentencing court made a finding of severe bodily injury. We find that the resentencing court erred in ordering all three terms of imprisonment to run consecutively.

¶ 145        This court possesses the authority to order correction of the mittimus rather than remanding to the sentencing court. Ill. Sup. Ct. R. 615 (eff. Jan 1, 1967); *People v. Denis*, 2018 IL App (1st) 151892. Accordingly, we order the mittimus to be corrected to reflect that

the 21-year term of imprisonment is to run consecutively with the 6-year term for aggravated battery with a firearm and the 5-year term for aggravated discharge of a firearm, but that the 6-year term and 5-year term are to run concurrently with each other, for a total term of 27 years.

¶ 146                                III. CONCLUSION

¶ 147        For the foregoing reasons, we affirm the decisions of the circuit court, but order that the mittimus be corrected.

¶ 148        Affirmed; mittimus corrected.